WILSON et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. August 20, 1911.)

No. 295.

1. POST OFFICE (§ 48*)—WRONGFUL USE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT—STATUTES.

Where an indictment for the use of the mails in furtherance of a scheme to defraud, in describing the offense, charged that defendant devised and intended to devise a scheme and artifice to defraud divers persons of their money and property, in and by inducing by false and fraudulent representations and pretenses, and by fraudulent artifices and devices, such persons to part with their money and property, did not, by the use of the words "by false and fraudulent representations and pretenses," state an offense solely within Cr. Code (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1909, p. 1455]) § 215, in which the words "by means of false or fraudulent pretenses, representations or promises" are added to the language of Rev. St. § 5480 (U. S. Comp. St. 1901, p. 3696), prohibiting the use of the post office in furtherance of a scheme to defraud, in force at the time the offenses were committed, and the indictment, notwithstanding such words, sufficiently stated an offense under section 5480.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 66–80; Dec. Dig. § 48.*]

2. INDICTMENT AND INFORMATION (§ 109*)—STATUTORY OFFENSES.

Where an indictment properly states an offense under a statute in force when the offense was committed, the validity of the indictment is in no way affected by the fact that it may also be sufficient to state an offense under a later statute carrying a heavier penalty.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 286–288; Dec. Dig. § 109.*]

3. INDICTMENT AND INFORMATION (§ 70*)—FORM—POSITIVENESS—RECITALS.

An indictment, alleging that at a particular time defendants had devised a fraudulent scheme, sufficiently charges that defendants theretofore "did" devise such scheme, and was therefore not defective as pleading the scheme or artifice by way of recital only.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 192; Dec. Dig. § 70.*]

4. POST OFFICE (§ 48*)—WRONGFUL USE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT.

Where an indictment for devising a scheme to defraud, to be effected through the post office department, charged defendants with devising a scheme or artifice to defraud, the fact that it also added the words "in and by inducing by false and fraudulent representations and pretenses" persons to part with their money, did not limit the government to the common-law offense of obtaining money by false pretenses.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 66–80; Dec. Dig. § 48.*]

5. POST OFFICE (§ 35*)—WRONGFUL USE OF MAILS—"SCHEME TO DEFRAUD."

A scheme to induce persons to purchase stock in a corporation by false and fraudulent representations that the money paid would go into the corporation's treasury for development purposes, that the officers would not sell their shares and believed that they would become of enormous value, that stock held by officers was nontransferable, that only treasury stock was on the market, and that all increases on the selling of the stock was justified by the development of the business, was a "scheme and device to defraud" within Rev. St. § 5480 (U. S. Comp. St. 1901, p. 3696), prohibiting the use of the mails in furtherance of a scheme or artifice to defraud, etc.; the statute being intended broadly to prevent the use of the mails to despoil the public, whether such result was intended to be accomplished by plain falsehoods, or by the most alluring and complicated contrivances.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.*]

6. POST OFFICE (§ 35*)—WRONGFUL USE OF MAILS—SCHEME TO DEFRAUD.

In a prosecution for wrongful use of the mails, in furtherance of a scheme to defraud by the sale of corporate stock by false representations, it was not essential that the government allege or prove that the stock sold was worth less than the price paid for it and that the purchasers were, in fact, damaged thereby.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.*]

7. POST OFFICE (§ 35*)—WRONGFUL USE OF MAILS—SCHEME TO DEFRAUD.

Use of the mails in furtherance of a scheme to defraud, by inducing the sale of stock in a corporation by false representations, that only treasury stock was to be sold, was not rendered innocuous by defendants placing an amount equal to the amount of the treasury stock in the corporation's treasury as a loan.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.*]

8. CONSPIRACY (§ 43*)—TO COMMIT OFFENSE—WRONGFUL USE OF MAILS—SCHEME TO DEFRAUD.

Where an indictment charged a conspiracy to devise a scheme to defraud in the sale of corporate stock and to have furthered such scheme by opening correspondence through the mail, it sufficiently charged a conspiracy to commit an offense against the United States.

[Ed. Note.—For other cases, see Conspiracy, Dec. Dig. § 43.*]

**9.** POST OFFICE (§ 35*)—SCHEME TO DEFRAUD—UNLAWFUL USE OF MAILS.

A scheme to defraud the public, by inducing them to send money to a corporation as the purchase price for its stock, which money the defendants, as officers of the company, could then embezzle, was none the less a public offense and a violation of the laws of the United States because it was also a private tort against the corporation.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.*]

**10.** CRIMINAL LAW (§ 150*)—LIMITATIONS—CONTINUING OFFENSES.

Where defendants devised a scheme to defraud, consisting of plans for the sale of corporate stock by false representations to be carried out by means of correspondence through the post office, the conspiracy was a continuing offense, and a prosecution therefor was not barred until three years from the last overt act.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 274, 275; Dec. Dig. § 150.*

Commencement of period of limitations against prosecutions for continuing offenses, see note to 84 C. C. A. 519.]

**11.** INDICTMENT AND INFORMATION (§ 124*)—PARTIES—JOINDER.

When certain persons combine to perform certain acts, and some of them combine with others engaged in totally different acts, though all may have a similar general purpose in view, it is improper to join them in an indictment for conspiracy.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 327–333; Dec. Dig. § 124.*]

**12.** INDICTMENT AND INFORMATION (§ 124*)—JOINDER—COMMUNITY OF INTEREST.

Where there was evidence of the original formation of a single joint conspiracy among the defendants to sell the stock of a corporation by false and fraudulent representations and of an original community of interests and general plan in which all the defendants participated, to a greater or less degree, they were not improperly joined in an indictment because they later formed agencies to sell the stock in different parts of the country, though some of the defendants profited from one agency, some from another, and one from both.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 327–333; Dec. Dig. § 124.*]

**13.** CRIMINAL LAW (§ 444*)—EVIDENCE—DOCUMENTARY EVIDENCE—BOOKS OF CORPORATION.

In a prosecution for wrongful use of the mails in furtherance of the scheme to defraud in the sale of corporate stock by false representations, the books of the corporation, regularly kept in due course of business, are admissible on the issue of the financial condition of the corporation, without verification of the entries by employés, in the absence of any contention that the books were not accurately kept.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1028; Dec. Dig. § 444.*]

**14.** CRIMINAL LAW (§ 396*)—EVIDENCE—BOOKS OF CORPORATION.

A person who makes statements concerning the affairs of a corporation cannot object when the regular books of the corporation are used against him.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 396.*]

**15.** POST OFFICE (§ 49*)—WRONGFUL USE OF MAILS—SCHEME TO DEFRAUD—EVIDENCE.

In a prosecution for using the post office in furtherance of a scheme to defraud in the sale of corporate stock by false and fraudulent representations, evidence *held* sufficient to sustain the conviction of all the defendants.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 49.*

Nonmailable matter, see note to 30 C. C. A. 79.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the Circuit Court of the United States for the Southern District of New York.

Christopher C. Wilson and others were convicted of using the mails to effect a scheme to defraud, and they bring error. Affirmed.

Writ of error to review a judgment of the Circuit Court, Southern District of New York, taken by the defendants, Christopher C. Wilson, William W. Tompkins and Francis X. Butler.

Said defendants, together with William A. Diboll and George H. Parker, were convicted under an indictment charging them, in the first three counts, with using the mails to effect a scheme previously devised by them to defraud, in violation of section 5480 of the Revised Statutes (U. S. Comp. St. 1901, p. 3696),[1] and, in the fourth count, with conspiring to commit an offense against the United States in violation of section 5440 of the Revised Statutes (page 3676); said offense against the United States forming the basis of the conspiracy count being the misuse of the mails in violation of section 5480.

The defendants other than Diboll were sentenced to terms of imprisonment. A fine was imposed upon the defendant Diboll, which was paid. The defendant Parker has withdrawn from the present writ of error so that it is prosecuted—as already stated—by the defendants Wilson, Tompkins and Butler alone.

Arthur M. King, for plaintiff in error Wilson.

John B. Stanchfield, for plaintiff in error Tompkins.

W. Bourke Cochran, for plaintiff in error Butler.

H. A. Wise, U. S. Atty., and G. H. Dorr, Asst. U. S. Atty. (Robert Stephenson, of counsel), for the United States.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). The most material questions presented by the assignments of error are these:

(1) Whether the first three counts of the indictment are based upon a statute in force when the alleged offenses were committed;

(2) Whether the first three counts set forth the scheme or artifice in question otherwise than by way of recital;

(3) Whether the averments in these counts limit the charge to using the mails to obtain money by false pretenses;

(4) Whether it was necessary for the government to show damage to persons buying the stocks;

(5) Whether the selling of the personal stock was fraudulent;

(6) Whether the fourth count charges a conspiracy to commit an offense against the United States;

(7) Whether the conspiracy count is barred by the statute of limitations;

(8) Whether there was a single or two separate conspiracies;

(9) Whether error was committed in the admission of documentary evidence;

---

[1] The contention that the first three counts are based upon section 215 of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1909, p. 1455]), and not upon Rev. Stats. § 5480, is considered in the opinion.

(10) Whether the evidence was sufficient to warrant the conviction of all the defendants.[2]

[1] The contention of the defendants regarding the first question is that the counts charging the misuse of the mails are based upon section 215 of the Criminal Code which went into effect January 1, 1910, and not upon section 5480 of the Revised Statutes which was in force at the time of the commission of the alleged offenses, and that the Criminal Code in relation to such offenses is ex post facto.

The relevant portions of the statutes in question are printed in the footnote[3] and from a comparison of them it appears that the Criminal Code adds the words, "by means of false or fraudulent pretenses, representations or promises" to the language of section 5480.

The indictment, in the general description of the offense, charges that the defendants "devised and intended to devise a scheme and artifice to defraud divers persons of their money and property in and by inducing by false and fraudulent representations and pretenses, and by fraudulent artifices and devices, said persons to part with such money and property."

It is urged that this use by the pleader of certain phrases appearing in the Criminal Code and not expressly appearing in the prior statute, necessarily establishes that the indictment is based upon the former and not upon the latter, and that as the Code increases the penalty and was not in force when the offense was committed the indictment based upon it is void.

In our opinion, however, the facts stated in the indictment, as distinguished from the general description, clearly disclose a scheme or artifice to defraud within section 5480, and this would undoubtedly be

[2] While the questions stated in the text are regarded as the most important in the case and the opinion is, for that reason, confined to an examination of them, it must be understood that the court has examined and considered all the other assignments of error which have been urged or relied upon by any of the defendants. It is thought to be sufficient to say, in respect of them, that, in the opinion of the court, they disclose no reversible error.

[3] R. S. § 5480 as amended: "If any person having devised or intending to devise any scheme or artifice to defraud, * * * to be effected by either opening or intending to open correspondence or communication with any other person, whether resident within or outside of the United States, by means of the post office establishment of the United States, * * * shall, in and for executing such scheme or artifice, or attempting to do so, place any letter or packet in any post office of the United States, or take or receive any therefrom, such person, so misusing the post office establishment, shall be punishable by a fine of not more than five thousand dollars, and by imprisonment for not more than eighteen months, or by both such punishments. * * * * "

Criminal Code, § 215: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter, postal card, package, writing, circular, pamphlet, or advertisement, whether addressed to any person residing within or outside the United States, in any post office, or station thereof, or street or letter box of the United States, * * * shall be fined not more than one thousand dollars, or imprisoned not more than five years or both."

sufficient even if the characterization of the offense were inappropriate. But, in our opinion, the general description in the indictment is not an inappropriate description of a "scheme or artifice to defraud" under section 5480. We think that a person who induces others by "false and fraudulent representations and pretenses" to part with their property is guilty of devising "a scheme or artifice to defraud" within the meaning of the statute.

[2] If then the indictment properly state an offense under the statute in force when it was committed, its validity is in no way affected by the fact that it may also be sufficient to state an offense under the later statute carrying a heavier penalty. So the indictment being sufficient under the statute it is immaterial whether the pleader had it or the Code in mind when he drew the indictment. Indeed, he may very well have had the language of the Code in mind as preserving the provisions of the statute with the interpretation placed upon them by the courts.

[3] With respect to the second question which we are to consider, the defendants contend that the first three counts of the indictment are bad because the scheme or artifice is pleaded by way of recital and not by direct averment.

The point of this contention is that the counts in question charge that the defendants on a given day had devised a scheme to defraud, and it is said that these allegations do not constitute positive averments of the commission of the offense of which the fraudulent scheme was a necessary part. In our opinion, however, the charge that at a particular time the defendants had devised a fraudulent scheme, sufficiently charges that the defendants theretofore did devise such scheme.

[4] The defendants' contention with respect to the third question stated is that the indictment by adding the words "in and by inducing by false and fraudulent representations and pretenses" to the express language of the statute, limits the charge to the offense of scheming to obtain money by false pretenses and of using the mails to that end. Based upon this proposition these further contentions are made:

(1) That the offense of obtaining money by false pretenses is not a "scheme and device" within the statute.

(2) That if such offense be within the statute, the trial court erred in receiving evidence of false pretenses and representations as to the future.

Here again we think that the defendants lay too much stress upon the general description of the offense contained in the indictment. The particulars of the scheme are stated at length and it appears clearly that the defendants are not charged merely with misrepresentations as to past facts but as to the future as well. But even confining ourselves to the general description, we think the government not tied down to the common law offense of obtaining money by false pretenses. The defendants are charged with devising a "scheme and artifice to defraud" not only by inducing persons to part with their money by false representations but "by fraudulent artifices and devices." Taking the averments together we think that a "scheme and artifice" within the meaning of the statute is averred.

[5] Notwithstanding the argument of the defendants we have no doubt that a scheme to induce persons to purchase stock in a corporation by false and fraudulent representations that the money paid for it would go into the treasury of the corporation for development purposes; that the officers of the corporation would not sell their shares and believed that they would become of enormous value; that stock held by officers was nontransferable; that only treasury stock was on the market, and that all increases in the selling price of the stock were justified by the development of the business, is a "scheme and device to defraud" within the meaning of the statute. We cannot accept the defendants' contention that the mails are open for the dissemination of "plain, blunt, customary misstatements." On the contrary, we think that the purpose of the statute was the broad one of preventing the use of the mails to despoil the public, whether such result was intended to be accomplished by means of plain falsehoods, or by the most glittering, alluring and complicated contrivances.

In Durland v. United States, 161 U. S. 313, 16 Sup. Ct. 511 (40 L. Ed. 709), the Supreme Court of the United States said:

"But beyond the letter of the statute is the evil sought to be remedied, which is also significant in determining the meaning. It is common knowledge that nothing is more alluring than the expectation of receiving large returns on small investments. Eagerness to take the chances of large gains lies at the foundation of all lottery schemes, and, even when the matter of chance is eliminated, any scheme or plan which holds out the prospect of receiving more than is parted with appeals to the cupidity of all.

"In the light of this the statute must be read, and so read it includes every thing designed to defraud by the representations as to the past or present, or suggestions and promises as to the future.

\* \* \* \* \* \* \* \* \* \* \* \* \*

"It was with the purpose of protecting the public against all such intentional efforts to despoil, and to prevent the post office from being used to carry them into effect, that this statute was passed; and it would strip it of value to confine it to such cases as disclose an actual misrepresentation as to some existing fact, and exclude those in which is only the allurement of a specious and glittering promise."

[6] The defendants' contention in respect of the fourth question stated is that it does not appear from the indictment or proof that the stock which the defendants sold was worth less than the price paid for it and consequently, that an essential element of the offense charged, i. e., damage, was not established.

It is not necessary to determine in this case whether actual injury is an essential element of a civil action for fraud. There are some cases which hold that even in such an action a party is entitled to the benefit of the terms of the fraudulent contract and that the measure of damage is the difference between the real value of the property purchased and the value which it is represented to have. On the other hand it is held in other cases—and much more logically—that an action of fraud is in disaffirmance of the fraudulent contract and that a party can only recover according to the extent of his injury, viz., the difference between the value of that which he paid and that which he received.

But whatever may be the rule in civil cases, we are satisfied that damage is not made an essential element of the federal statutory of-

190 F.—28

fense of using the mails to execute a scheme or artifice to defraud. We are of the opinion that a scheme or artifice is established by proof of false and fraudulent misrepresentations by which a person's right of open and fair dealing is invaded; that having shown that the defendants used false and fraudulent means to induce persons to part with their property and to purchase stock which was not of the value represented, the government was not required to go further and prove either the existence or extent of damage to the purchasers.

Any other construction of the statute would deprive it of all force in dealing with fraudulent schemes in the guise of legitimate corporate enterprises and would place a premium on lies and deceit: It would only be necessary to deal in a stock of uncertain value, e. g., of a corporation owning patent rights, and all the false and fraudulent statements imaginable could be made with impunity and the mails be used to prey upon the public. Purchasers would not obtain that which they were promised; their money would be obtained by false and fraudulent representations, but in how many cases could the government show that they failed to get their money's worth? How could the real value of such shares be established?

In Kellogg v. United States, 126 Fed. 323, 326, 61 C. C. A. 229, 232, this court said of the statute now under consideration:

"Since Congress did not make the benefit of the wrongdoer an element, it would seem to be judicial legislation for the courts to require such benefit to be alleged and proved."

As a corollary to this conclusion we think it follows that damage to purchasers from which benefit to the wrongdoer would result, is likewise not necessary to be alleged and proved.

In Horn v. United States, 182 Fed. 727, 105 C. C. A. 169, the Circuit Court of Appeals for the Eighth Circuit stated the essential elements of an indictment under section 5480 without including damage, and with respect to the allegation of the indictment concerning the value of the stocks which the fraudulent scheme was devised to sell, said:

"It is sufficiently alleged that the stock of the mining company was not of the value that the defendants were to falsely represent it to be.".

In so far as Miller v. United States, 174 Fed. 35, 98 C. C. A. 21, is in conflict with the conclusions stated, we are unable to follow it.

[7] With respect to the fifth question, it is contended that there was no fraud in the sale by the defendants Wilson and Tompkins of the stock belonging to them personally notwithstanding the representations that only treasury stock was to be sold provided they put the proceeds of such sale into the treasury of the corporation even if they did so by loans. In our opinion, however, there is a material difference, directly affecting purchasers of shares, between the financial condition of a corporation which has, for example, $100,000 in its treasury as the result of sales of its treasury stock and that of a corporation whose treasury stock is unsold but which has obtained $100,-000 by borrowing from its officers.

[8] The gist of the contention of the defendants with respect to the

sixth question which we have stated is that the conspiracy count does not charge a conspiracy to commit any offense against the United States but only charges a conspiracy to devise a fraudulent scheme or artifice in contravention of state laws. It is urged that devising a scheme to defraud in and of itself is not forbidden by any statute of the United States and the fact that the conspirators may have intended to use the mails as a part of their scheme was merely an incident of the scheme and insufficient to bring the conspiracy within the federal statute.

[9] In our opinion, however, the count sufficiently charges a conspiracy to commit an offense against the United States when it charges a conspiracy to devise a scheme to defraud and to execute such scheme by opening correspondence through the mails. We think that persons conspire to commit an offense against the United States when they conspire to commit an offense which can be carried into effect only by violating the laws of the United States. We also think without foundation the contention of the defendants that the offense which the indictment alleges that they conspired to effectuate was not a crime or a fraud upon the public but a private tort against the United Wireless Company. Undoubtedly embezzlement from the corporation would not, in and of itself, constitute a scheme to defraud the public by the use of the mails. But a scheme to defraud the public by inducing them to send money to the corporation which the defendants could then embezzle would be rendered none the less a public offense by the intervention of the corporate entity.

[10] The defendants' contention with respect to the seventh question which we are to consider is that the conspiracy charge is barred by the statute of limitations.

The indictment fixes the date of the conspiracy as December 8, 1908, which was within three years of the filing of the indictment. It seems to be conceded, however, that the date of the original agreement, the meeting of the minds of defendants, was more than three years before the indictment and that if the date of such agreement can be treated as the date of the conspiracy, it was barred by the statute of limitations. It is also practically conceded, in view of the decision of the Supreme Court in United States v. Kissel, 218 U. S. 601, 31 Sup. Ct. 124, 54 L. Ed. 1168, that if the conspiracy were a continuing one it was not barred by the statute because its operation continued at least up to the date specified in the indictment.

In our opinion the averments of the indictment with respect to the nature of the conspiracy as well as the proof itself show that it was necessarily a continuous one. In the language of Mr. Justice Holmes in the Kissel Case, "A conspiracy is a partnership in criminal purposes." Such a complex and far-reaching partnership as that described in the indictment requires continuance of operation to accomplish its object and continues until such purposes are accomplished or the partnership abandoned.

We are unable to appreciate the distinction between a conspiracy to close a factory so that it will not be a competitor of the conspirators —as in the Kissel Case—and a conspiracy to dispose of a large amount

of stock to whomever may be induced to buy, which necessarily contemplates a continuance of selling until the amount of stock controlled by the conspirators shall be sold. If in the one case the conspiracy continues "fresh every day" until the factory is permitted to open, it seems clear, in the other case, that it continues until the conspirators cease disposing of the stock or give up the scheme.

It is also urged that the Kissel decision is inapplicable because the present indictment does not contain in express terms a continuando. As just pointed out, however, we think that the averments of the indictment with respect of the nature of the conspiracy necessarily involved the allegation that the conspiracy was a continuous one and were equivalent to an express allegation that it had continuance in time.

With respect to the eighth question before us the defendant Butler especially urges that the proof offered to support the indictment establishes not one conspiracy but two, and that with one of them said defendant had no connection.

[11] We do not question the correctness of the proposition stated in behalf of said defendant that when certain persons combine to perform certain acts and some of them combine with others engaged in totally different acts, though all may have a similar general purpose in view, it is error to join them in an indictment. Applying this principle in the present case, if the proof failed to show co-operation or concerted action among the defendants prior to the formation of the New York Selling Agency and the Western Selling Agency, we think there would be much ground for contending that neither the presence of the defendant Wilson in both agencies nor the common object of selling the stock of the United Wireless Company was sufficient to show a single conspiracy. [12] But we think that there was evidence to warrant the jury in going back of the agency agreements in finding a single general conspiracy among the defendants to sell United Wireless stock; an original community of interest. And if there were an original general plan in which all the defendants participated—some in greater and some in less degree— it was not, in our opinion, split up into separate conspiracies by the later formation of the agencies to sell the stock in different parts of the country even though some of the defendants profited from one agency and some from the other, and the defendant Wilson from both.

[13] The next question is whether error was committed in the admission of documentary evidence.

For the purpose of showing the sales of personal stock by the defendants in the face of representations that no personal stock was being sold and that the only stock being sold was treasury stock of the United Wireless Company, the government was permitted to introduce the stock books of that corporation together with tabulations based thereon.[4]

---

[4] Certain other books and reports were also introduced in evidence, but we think their admission governed by the same general principles as the stock books and they are not separately considered.

The defendants contend that the admission of these books was a violation:

(1) Of their constitutional right granted by the sixth amendment to be confronted with the witnesses against them;

(2) Of the rule against hearsay testimony.

Without passing upon the question whether a strict adherence to the constitutional provision required all the persons who made the entries in the books to be called as witnesses or whether the testimony was of such nature as to constitute a recognized exception to the rule, it is sufficient to say that we think the defendants waived their constitutional privilege if it existed.

No point was made that the witnesses who made the entries were not called. The accuracy of the books was not questioned. The only ground of objection was that the defendants were not responsible for books which they did not keep; "in other words, that these people are not chargeable in a criminal litigation with entries in the books to the making of which they are not shown to have been parties."

The question then resolves itself into the inquiry whether the rule against hearsay testimony operates against the admission of the books or whether the trial court was right in overruling the objection made by the defendants as just stated. Manifestly the testimony was relevant and material. As the defendants themselves say, it went to the very heart of the case. Manifestly also the stock books would be considered to furnish the very best history of its shares in any business matter or transaction in commercial life. Regular entries, such as books of this nature contain, afford the basis of undertakings of the greatest magnitude and it would be a rare case where investor or man of business would call for the verification of entries by employés, which verification could ordinarily be obtained only with much difficulty.

In our opinion these considerations should have great weight in a court of law although we do not feel called upon in the present case to state any broader exception to the hearsay rule than the necessities of the case require. It is sufficient now to say that we think in any case, civil or criminal, where the question presented is whether statements made by a party relating to, or involving an inquiry into, the history or transfers of the shares of a corporation or representations concerning the financial condition of a corporation are true or false, and no contention is made that the books of the corporation have not been accurately kept, that such books—the stock books and other books—regularly kept in due course of business should be received in evidence in proof of the statements they contain. It would be practically impossible to establish the truth or falsity of the statements or representations in any other way. If possible it would involve—taking the stock books for example—a lamentable waste of time serving no useful purpose, to establish the actual signatures in hundreds of cases where no one suggests that any signature is a forgery. [14] Moreover, a person who makes statements concerning the condition or affairs of a corporation is not in a position to object when the regular books of the corporation are used against him. If he be

an officer of the corporation and make such representations he should certainly be bound by the books and if he be a stranger and make statements without knowledge he cannot complain. We think that the rulings of the trial court upon the documentary evidence were correct.

[15] The final question to be considered is whether the evidence was sufficient to warrant the conviction of the different defendants.

It is apparent from an examination of the record that the defendant Wilson was the master mind in the scheme for the exploitation of the United Wireless Company and it is not seriously contended in his behalf that there was not sufficient evidence of his guilt upon all the counts to go to the jury.

The defendants Tompkins and Butler stand in a different position. They were undoubtedly under the domination of the defendant Wilson. They took comparatively minor parts in the general plan. If the government were required to establish the scheme to defraud or the existence of the conspiracy by testimony limited to the acts of these particular defendants, it would undoubtedly fail. But such would be the result in the case of any complex scheme participated in by a number of persons if it were sought to hold one of the less conspicuous participants by proof confined to its own acts. In every such case the existence of the conspiracy must necessarily be shown by general evidence and the vital question then is whether the particular defendant actually took part in it. And in view of the fact that the sentences imposed upon these defendants might have been imposed for conviction under the conspiracy count alone, it seems only necessary to consider that question here.

Moreover, in considering the testimony concerning these defendants, it must be borne in mind that combinations and conspiracies are seldom to be proved by formal agreements. All the facts and circumstances must be considered and the acts of the particular defendants must be looked at with reference to them. Moreover, the question is not what view this court would take of the testimony but what view the jury had the right to take of it. The judgment cannot be reversed unless the evidence were such that the trial court erred in submitting the question of the guilt of these defendants to the jury.

. We have carefully considered the testimony concerning the defendant Tompkins, although we think that no useful purpose would be served by reviewing it in detail. It is sufficient to say that in view of the connection of this defendant with the prior De Forest Company and of his continuous connection with the United Wireless Company in various capacities as well as of his participation in the selling agency agreement and of his other acts as disclosed by the record, we think that there was evidence to warrant the jury in finding his guilty knowledge of, and participation in, the conspiracy and scheme to defraud.

So, we have carefully considered the testimony concerning the defendant Butler. We were impressed upon the argument with a doubt whether there was sufficient evidence to go to the jury connecting him with the conspiracy, but an examination of the record convinces us that the trial court was right in submitting to the jury the question

of his guilt. His long association with the old De Forest Company and the persons in charge of it, his subsequent connection with the Wireless Company, his participation in the selling agency contracts, his attendance at a stockholders' meeting, where questionable resolutions were passed, and the various matters which the testimony shows were brought to his notice, justified, in our opinion, the action of the court. We are satisfied that something more than the relation of attorney and client existed between this defendant and the Wireless Company and its promoters and that the evidence was such as to warrant the jury in finding his participation in the conspiracy.

With respect to both the defendants Tompkins and Butler, there was one item of evidence—the agency agreement in which they both participated—which, in and of itself, was most suspicious and furnished some ground at least for the jury to draw the inference of guilty knowledge. The commission of 50 per cent. for the sale of United Wireless stock was most remarkable. A court may almost take judicial notice of the fact that the stock of a corporation selling for twice its par value does not require the payment of such a commission to dispose of it. If it does, the selling price must be altogether artificial. The inference must be either that the company is fraudulent if the commission is not excessive or that the commission is fraudulent if the company is what it purports to be.

For these reasons, we reach the conclusion that no error was committed in the trial of the three defendants. Moreover, after an examination of the evidence, we think that their conviction was right: While their original purpose may have been legitimate, while they may have believed in the future of wireless telegraphy, we are satisfied that they deliberately entered into a scheme to take advantage of the public interest in a great and meritorious invention to sell to the public thousands of shares of stock which they knew to be practically worthless. They could accomplish their objects only through the use of the mails, and through the use of the mails has come their condemnation under a federal statute. But the judgment will not serve the purpose it ought to serve if it be regarded merely as inflicting punishment on these defendants. It should reach far beyond them and serve as a warning to that vast crowd of speculators, promoters, gamblers and adventurers who pose as men of business and affairs and carry on their operations in the borderland between legitimate undertakings and criminal schemes. It ought to bring home to their understanding that the misappropriation of other peoples' moneys is not distinguished from larceny by designating the process a great corporate enterprise; that inducing hundreds of men and women to part with hundreds of thousands of dollars for worthless securities calls for condemnation just as much as cheating in the sale of a single musical instrument or photograph album; that after all there is no merit in wholesale knavery over cheap tricks or in gilded devices over barefaced swindles, and, furthermore, that neither swindlers of high degree nor cheats of low station can employ with impunity the mails of the United States in aid of their fraudulent schemes.

The judgment of the Circuit Court is affirmed.