HART et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. March 20, 1917.)

No. 113.

1. CRIMINAL LAW ⬅1163(3)—APPEAL—PREJUDICIAL ERROR—EVIDENCE UNDER SEPARATE COUNTS.

Where the indictment charged, under Criminal Code (Act March 4, 1909, c. 321), § 37, 35 Stat. 1096 (Comp. St. 1913, § 10201), a conspiracy to use the mails in furtherance of a scheme to defraud, and also contained numerous counts charging the offense of using the mails to defraud, contrary to section 215 (section 10385), and after a great deal of evidence had been admitted under the conspiracy charge, which would have been inadmissible under the other counts, the jury acquitted defendants of the conspiracy, but convicted them of some of the other charges, the record must be closely scanned to determine whether that evidence may not have been prejudicial to defendants in the jury's consideration of the charges on which defendants were convicted.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3094, 3095.]

2. INDICTMENT AND INFORMATION ⬅117—CONSTRUCTION OF INDICTMENT—TECHNICAL FRAUD.

Though the owners of the stock of a corporation may technically commit a fraud on the corporation, such an offense would be so technical and so contrary to ordinary understanding that an indictment will not be construed to charge it, if such construction may be avoided.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 310.]

3. POST OFFICE ⬅49—USE OF MAILS TO DEFRAUD—EVIDENCE—REFERENCES.

Where an indictment charged the use of the mails to defraud, and the evidence showed that defendants had offered for discount certain notes on which insolvent corporations controlled by them were either makers or indorsers, it was error to exclude evidence that defendants gave as references other banks, and that the bank asked to make the discount made inquiries from some of the banks given as references, since a broad description of that offense is that it is a violation of the right to open and fair dealing, and evidence to show exactly what the dealing was is always admissible.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86.]

4. CRIMINAL LAW ⬅663—EVIDENCE—DECLARATIONS OF THIRD PERSONS—STATEMENTS TO DEFENDANT.

In a prosecution for using the mails in the execution of a scheme to defraud by the floating of notes exchanged between two corporations, it was error to permit the letter of an attorney for one of those corporations, to one defendant, charging him with numerous crimes and falsehoods, who had thereafter interviewed that defendant, to be read to the jury as a statement made to the defendant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1602.]

5. POST OFFICE ⬅50—OFFENSES—INSTRUCTION—MAILING PARTICULAR LETTER.

In a prosecution for using mails to defraud by floating worthless paper, where there was no evidence as to the mailing of the particular letter charged in some of the counts, it was error to refuse requested charges that, in order to convict, the jury must believe beyond a reasonable doubt that the particular letter mentioned and described in each count was mailed or received by mail; there being nothing in the general

charge to point out the necessity of proving the mailing or receipt of those particular letters.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89.]

6. CRIMINAL LAW &655(4)—TRIAL—MISCONDUCT OF JUDGE—CHARGES AGAINST DEFENDANT.

Where the judge, on being informed that certain persons claiming to be detectives had interviewed the jurors summoned for the term, directed an examination of those jurors, which disclosed only that the detectives had falsely made certain investigations as to the panel, but did not disclose any attempt to tamper with the jury, it was error for the court, in the presence of that panel from which the jurors who tried defendants were subsequently selected, to use the word "tampering" in connection with the acts of the detectives, and subsequently to charge defendants with having endeavored to do something wrong to the jury, which charge there was no evidence to support.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1521.]

In Error to the District Court of the United States for the Northern District of New York.

Max M. Hart and another were convicted of using mails in furtherance of a scheme to defraud, contrary to Criminal Code, § 215 (Comp. St. 1913, § 10385), and they bring error. Reversed.

See, also, 214 Fed. 655; 215 Fed. 135; 216 Fed. 374.

Hart and Wupperman were jointly indicted with Andrew S. Work and Frank W. Fowler for a conspiracy under Criminal Code, § 37, to commit an offense against the United States, viz. to devise a "scheme to defraud," etc., under section 215, and for actual violation of section 215. The alleged conspiracy was charged in count 1, and the substantive offenses in counts 2 to 10. All the defendants were tried on all the counts, and the jury acquitted them all of the conspiracy charge, found Hart guilty on counts 2, 3, and 4 only, and Wupperman, Work, and Fowler guilty on all the substantive counts, viz. 2 to 10, inclusive. Work and Fowler, who had testified as witnesses for the prosecution, had not been sentenced, when Wupperman and Hart took these writs.

Henry A. Wise, of New York City, for plaintiff in error Hart.

Arthur Furber, of New York City, for plaintiff in error Wupperman.

Thomas H. Dowd, Sp. U. S. Atty., of Cortland, N. Y.

Before COXE, WARD, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The scheme complained of is charged in the same way in the conspiracy and substantive counts, and is as follows: Prior to August 15, 1913 (the date of conspiracy), the four defendants had devised a scheme to obtain money by false pretenses, representations, etc., from a long list of persons and corporations (banks for the most part), by inducing said persons, etc., to part with their money in the discount or purchase of the promissory paper of, especially, the Oneida Milling Corporation (hereinafter called Oneida Company) and the Anger Baking Company (hereinafter called Anger Company); the money so obtained to be diverted to the use of defendants. It was also a part of the scheme to obtain said promissory paper from Oneida Company and Anger Company et al. by fraud, and to sell the same by means of false rep-

resentations to the effect that the notes so sold had been executed and delivered for a lawful consideration and in the due course of business, and also by representing that the makers and indorsers of said notes were solvent and able to pay at maturity.

It is not easily ascertainable from this indictment whether the pleader asserts that the scheme consisted in defrauding the persons issuing the notes or the person discounting or buying the same. The indictment may be read as asserting that the scheme consisted in doing both these things. Without delaying to inquire what effect upon the sufficiency of the indictment this uncertainty may have, we shall accept, for purposes of review, the interpretation of the pleading given at bar on behalf of the prosecution, viz. that the unlawful scheme was "to use the mails to defraud various banks, persons, etc., in the discount and purchase of the promissory notes of the Oneida Company and other business concerns," a process further described as "the corrupt exploitation of the Oneida Company."

The overt acts stated in the conspiracy count are to a considerable extent covered by the nine substantive counts, of which the second and third (on which Hart was convicted) rest on the handling of certain Oneida Company and Anger Company notes issued in exchange for each other; the fourth count (on which Hart was also convicted) relates to the negotiation through Oneida Company of the promissory note of one Hindley. The remaining five counts (on which Hart was acquitted) rest upon various transactions legally similar to either the Anger or Hindley occurrence, and all pleaded as part of the same fraud or device; the necessity for counts (as to the substantive charge) growing solely out of the several separate uses of the mail.

The plan of prosecution or exposition of this scheme was to show that nearly a year and a half before the formation of the alleged conspiracy the defendant Work had purchased Oneida Company's property and engaged in the milling business. Thereafter in his search for financial assistance, or for some one to whom he could sell his recent purchase, he met Wupperman (who was obviously a speculator), Hart (who was a note broker dealing at high rates with needy borrowers), and Fowler, who had no very well-defined business, but was willing to take up that of milling if some one financed him.

The method of financing was always to borrow money. Such borrowing was usually by exchange of paper, so that each borrower would have two-name paper to discount wherever it could be marketed. Wupperman (for his firm) agreed to do this with Oneida Company as early as May 22, 1913, to the extent of $40,000, the object of which was to enable Fowler to get control of Oneida Company and ultimately convert most of Work's ownership interest into a mortgage debt. This plan was not fully carried out, apparently because Work distrusted Hart, and refused Hart's co-operation in the Wupperman-Fowler plan. As the result of this difference, if not quarrel, Work was, at the date of forming the alleged conspiracy, bought out of Oneida Company (largely with paper), and the control of that corporation fell to Wupperman and Fowler. Thereupon Work left the neighborhood, went to Chicago, and did not apparently return until

240 F.—58

February, 1914, when he filed a petition in bankruptcy against Oneida Company. This was long after all the occurrences alleged in the indictment. It was the effort of the prosecution to convince the jury that this buying out of Work was either a prelude to or part of the scheme, to use Oneida Company's name and credit for swindling purposes.

Shortly after Work's retirement, Hart was approached by the president of Anger Company, a bakery business much in need of cash. Hart suggested an exchange of notes, to'the amount of $25,000, between Oneida Company and Anger Company. As one concern made flour and the other bread, the joint borrowing was suggested as appropriate. This procedure was adopted, the Oneida Company notes being sent by mail to Wupperman's office (second count), and one of the Anger Company notes also sent by mail to a bank in Buffalo for purposes of discount (third count).

Within about a month after the formation of the alleged conspiracy, Fowler and Wupperman being in control of Oneida Company, Hart asked Fowler whether he could not procure the discount of the note of one Hindley, who had no connection at all with the business of any of the defendants, or of Oneida Company. Fowler did so through Oneida Company, and by means of its indorsement, and forwarded by mail to Hindley, through Hart, about one-quarter of the proceeds of discount (fourth count); the rest remained to the credit of Oneida Company so far as Hindley was concerned. The remaining counts (except the tenth, which is so general in terms as to be negligible here) relate to transactions generically like the Anger or Hindley "deals," but all sought to be shown by evidence, as parts of one connected fraudulent plan, whereby, having procured Oneida Company, mostly with paper made or indorsed by itself, that company was used to float other paper, to the injury of its ultimate holders, and some of its indorsers, and the profit of defendants, who were to get cash or credit on said paper, before the crash, of which the inevitable arrival must have been plain to every defendant.

As the result of transactions extending over some months after August 15, 1913, and many months before that date, there became outstanding a considerable amount of paper, widely distributed, on which, either as maker or indorser, Wupperman's firm, Oneida Company, or Anger Company were liable, and each one of these concerns, before indictment found, had become insolvent, or bankrupt, or both. It is entirely obvious that in a very true sense this prosecution has grown out of these insolvencies. However badly managed these several businesses were, however ill-advised, unattractive, and even dishonorable the method of raising money by exchange of paper may be, it remains necessary, if the criminal law is invoked, to show beyond reasonable doubt, not only bad management, negligence, and dishonorable conduct, but guilt of the particular crimes alleged, which (in this instance) depended wholly on proof of defendants' agreement to commit a fraud and use the mail therefor in the case of conspiracy, and the actual use of the mail in the execution or attempted execution of said fraud in the case of the substantive charges.

[1] It is notoriously true that, in prosecutions such as this, the conspiracy count is tacked upon the principal charge, for the purpose (well known, if not avowed) of widening the field of evidence, and introducing testimony of a large number of occurrences wholly unrelated to the actual fraud of which the defendants are accused, in order to show co-ordination of effort on the part of the alleged conspirators, from which the agreement or consent of minds (the gist of conspiracy) may be inferred. This was done in this case. The whole history of Work's efforts to sell Oneida Company, and Fowler's desire to purchase what he was confessedly unable to pay for, Wupperman's willingness to contribute some money against a larger amount of paper which he could negotiate for his own purposes, while lending his firm's name to Fowler's enterprise, and Hart's willingness (at a heavy price) to assist the efforts of the others, were all shown to the jury without any visible legal basis therefor, other than the conspiracy charge. All of this testimony formed part of a connected story, not charged to be criminal, except as it tended to show confederation; yet it could not but create serious prejudice against those persons who (whether they had conspired or not) had taken a larger or smaller part in the negotiation and sale of promissory paper issued and received in a manner repugnant to the mind of any prudent and scrupulous business man.

Thus the action of the jury in acquitting all the defendants of the conspiracy charge has (under the circumstances of this case) laid a heavy burden on the prosecution to uphold the conviction for substantive offenses. The verdict of not guilty of conspiracy left for the jury's inevitable consideration a mass of testimony immaterial to the issues passed upon adversely to these plaintiffs in error and their codefendants, yet extremely prejudicial to them. The possibility of this illogical and injurious result inevitably flows from the settled habit of prosecutors (in this circuit at least) of hitching on a conspiracy charge to a substantive count. We do not, of course, impugn the legality of the practice. Usually the same evidence proves the conspiracy and the substance; sometimes the substance is never reached, the criminal effort does not get so far, and conspiracy alone is proved; but to acquit of conspiracy, and convict of substance, produces a condition requiring a scanning of the record to ascertain whether, under cover of the unsuccessful charge, the successful one (over due objection) has been bolstered up.

The situation just adverted to is acute in this case, because the defendant Work was the first, and a very prominent, witness for the prosecution. As he was never sentenced, he has nothing to appeal from. But all the defendants were acquitted of conspiracy, and we are unable to perceive that Work had anything to do with the "scheme" of the indictment. His own story was, in substance, that he had been victimized by the other defendants; that is, that he had been induced to part with the Oneida Company and had never been paid for it. It may have been admissible (in the main) under the conspiracy charge; but for any other purpose it is fairly described as permitting a disappointed investor to state his opinion of the persons who had disap-

pointed him. When matters subsequent to August 15, 1913, are considered, the gravamen of the charges in the substantive counts is that some or all of the defendants made, directly or otherwise, false representations whereby they floated, discounted, or exchanged the worthless paper of Oneida Company.

[2, 3] We adopt this view of the counts, not only because it is that of the prosecution as announced in argument, but because to speak of defrauding Oneida Company, after Work had retired from its ownership or management and become a creditor, is so technical as to border upon the absurd. Wupperman and Fowler were (in common parlance) the Oneida Company, and while one who "owns" a corporation may technically commit a fraud upon it, such a reading of any indictment should be avoided, if possible. Since, therefore, disposing of Oneida Company's paper by means of false statement or suggestion is the gist of the offense charged, it follows that defendants were entitled to have in evidence and considered by the jury every statement, written or oral, made, suggested by, or emanating from them, and brought to the attention of the persons alleged to have been defrauded in respect of the notes negotiated with or through the person or corporation said to have been injured.

We have pointed out (Wilson v. United States, 190 Fed. 434, 111 C. C. A. 231) that a violation of the "right of open and fair dealing" is a broad but justifiable description of the offense proscribed by the statute now in question. It is a corollary from this that evidence must always be admissible to show exactly what the dealing was, which the prosecution claims to have been neither open nor fair. We select one illustrative instance (out of several), where the rights of these defendants were, in this regard, denied. Some of the defendants had become interested in the Crawford County Gas Company, an enterprise doing business and having property not far from Franklin, Pa. They offered for discount at the Franklin Trust Company certain notes of Oneida Company, payable to and indorsed by Wupperman's firm and also by said Crawford County Gas Company. In order to induce this discount, references were given by these plaintiffs in error to sundry banks and bankers in and near New York City. Three of the parties referred to answered inquiries made by Franklin Trust Company, and gave their views of the reliability of Wupperman or Hart. The very matter at issue being whether, in the negotiation of these notes with the Franklin Trust Company, the scheme to defraud was being executed, these references (by which the Franklin Trust Company had admittedly been influenced) were refused admission in evidence. This was error and upon a vital point.

[4] One of the transactions most discussed before the jury, and the one having probably the widest ramifications, was the exchange of notes between Oneida Company and Anger Company. There was ample proof that this exchange had been suggested by Hart, and also that such "pooling of issues" between the two companies for floating an aggregate of $50,000 of notes, on each of which both companies would be liable either as maker or indorser, was to be profitable for Hart. On February 2, 1914, when matters had gone very wrong with

both Oneida Company and Anger Company, the attorney for Anger Company wrote Hart a letter, in which he accused Hart of a considerable number of crimes and falsehoods, and threatened that he would lay the matter before the prosecutor of New York county. Subsequently this attorney had an interview with Hart, at which there was discussion as to the accuracy of the statements of the letter. On this trial, this attorney testified as to his talk with Hart, and the letter aforesaid was admitted in evidence against Hart, as "a statement made to him." The reason is a novelty, and the action amounted to permitting a reputable member of the bar, a man of vigorous personality, substantially to make a speech, stating his very low opinion of one or more of the defendants. There is no pretense that what was said in the letter could have been repeated viva voce by the witness to the jury; yet such was its practical effect when read to the jury, the writer sitting by in the witness chair. This was grave error.

[5] In Kellogg v. United States, 126 Fed. 323, 61 C. C. A. 229, we pointed out that the use of the mails might be established by testimony showing that the success of a given scheme depended on such a wholesale use of the post that an intelligent man could reach no other conclusion from the evidence as to the nature of the business. The case cited was one of a fraudulent enterprise which only hoped for success through or by means of a flood of circulars. No such case is here presented. The scheme here charged bears no other or closer relation to the postal monopoly than does any minor legitimate business. Congress has seen fit to make a national offense out of any fraudulent scheme, if "for the purpose of executing" the same any letter, etc., shall be sent by post. An indictment that did not charge mailing or receiving and in the proper district would be demurrable. The point is jurisdictional, and cannot be slurred over in proof. It is not necessary to descend into particulars, but as to some of these counts there was no proof at all of any mailing of the "indictment letter." The defendants requested specifically an instruction that, in order to convict, the jury must believe beyond a reasonable doubt that the particular letter mentioned and described in each count was mailed or received by mail, as the case might be, which request was refused.

Such refusal might be immaterial if the matter had been covered in the general charge, but we find nothing in the charge pointing out in words or substance the absolute necessity of somehow proving, not the mailing or receipt of letters generally, but such action in respect of the particular letter named in each count of the indictment and vital to the jurisdiction of the court. The refusal to charge substantially as above indicated was error. The errors above pointed out would require reversal of these judgments; but the nature of this record imposes a duty of comment upon a proceeding occupying considerable space, even in this bulky record, and which should have no place therein.

[6] This case was set for trial a reasonable time before the opening of a term of court at Watertown, N. Y., and the jury panel was drawn in advance of the opening of court. Defendants, of course, had notice of the panel's existence, and were entitled to a list of the

jurors. Thereafter two men, who called themselves "private detectives," appeared in the neighborhood of Watertown and interviewed a number of citizens summoned upon the panel, asking questions as to whether they knew any of the parties or had heard of the nature of the impending trial, etc. Apparently before court convened some of the jurors had told the county judge of the presence and actions of these investigators, and this gentleman communicated his information to the District Judge and United States Attorney. As soon as this case was called, jurors were examined separately, on their voir dire, and those to whom the "private detectives" had spoken told their story.

Before the examination of the first juror was completed the court stated publicly that he had heard the juror's story before the opening of court, and "thereupon I told the United States Attorney that there might be something bad about it, that somebody had either taken it upon themselves, or that something had been done to tamper with the jury, and that I thought he ought to know it and look into the matter, if there was anything to find out." Thereupon objection was made by defendants to this method of investigation; it was overruled, and the matter proceeded. After a hundred pages of evidence and discussion, during which no improper conduct was shown in respect of investigating the jury panel, a motion was made to discharge the panel on the ground that the investigation was prejudicial to defendants. This application was denied, the court stating that the inquiry was "to find out whether these jurymen are competent to sit in this case. The man who set this proceeding on foot will be dealt with later"— to which remark an exception was taken. The matter then proceeded, and counsel for Hart objected specifically on behalf of his own client, stating that, while he did not undertake to justify the conduct of the so-called "detectives," "I had nothing to do with it, and I do not need the court or anybody else to exculpate me from it, for I know I had nothing to do with it, neither had my client; my client had nothing to do with it, and I know nothing about it"—whereupon the court remarked, "You certainly cannot prove it," while adding later that he was completely satisfied that counsel personally was not concerned.

Immediately after this incident the United States Attorney moved (for the second time) that Hart be committed to the custody of the marshal during the trial, whereupon the court remarked:

"I declined to do it (i. e., make the commitment) at that time (i. e., when first moved for), and then again to-day the assistant of the United States Attorney has made the same motion; and I said I would not pass upon it then, and I would not act upon it; and now not until this interference with this panel of jurors was made the basis by the defendants guilty of the wrong— may be they are not wrong—was attempted to be made the basis here to delay this trial and to discharge this panel of jurors now here three weeks, not until then did I feel called upon to exercise the strong hand and protect the jurors from any further interference. And the court as to other parties connected with this trial will exercise the same power just as soon as the facts appear, as they inevitably will and must. Now you can take an exception to that."

Exception was duly taken, and Hart was committed to custody. Examination of the panel was continued, and at a subsequent stage

of the trial proceedings before the jury were interrupted, in order to ask further questions about the conduct of these so-called detectives or their employer. The record discloses no reason for making this further investigation a proceeding in the trial; yet it may be said that nothing was ever shown that was criminal or corrupt, though the "detectives" seem to have been very foolish men. The important point is that, publicly and before the very persons who were to pass on the liberty of the defendants, the trial court, without any excuse appearing upon the record, applied the word "tampering" to what, so far as appeared then or thereafter, was a lawful (though somewhat silly) investigation into the personnel of the panel, and finally distinctly and publicly charged the defendants with having endeavored to do something (what, never appeared) wrong or improper in respect of the panel. For this charge we perceive no justification in the record; if there was justification, the panel should have been discharged. Defendants were entitled to have a jury impartial in a legal sense. It would be unreasonable to expect such a jury from a panel that defendants had tried to corrupt or "tamper with." But when a public examination of the prospective jurors themselves showed nothing but foolishness on the part of irresponsible "detectives," the quoted language of the court amounted to a public condemnation of certain untried defendants, before their very triers, for doing something else of which there was no evidence whatever. This we regard as very complicated error, vitiating the trial, irrespective of any of the other matters heretofore considered.

The judgments are reversed.