## HARRISON v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. December 3, 1912.)

### Nos. 2,220, 2,221.

1. POST OFFICE (§ 35*)—USE OF MAILS TO DEFRAUD—ELEMENTS OF OFFENSE—"SCHEME TO DEFRAUD."

Under Cr. Code, § 215 (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), making it a criminal offense to use the mails in aid of a "scheme to defraud," such scheme to defraud may be found in any plan to get the money or property of others by deceiving them as to the substantial identity of the thing which they are to receive in exchange, and this deception may be by implication as well as by express words. On the other hand, there must be the underlying intent to defraud, and such scheme to defraud cannot be found in any mere expression of honest opinion as. to quality, or as to future performance, nor in mere "puffing" or exaggeration in respect to articles which have substantial merit, if within any proper and reasonable bounds.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.*

For other definitions, see Words and Phrases, vol. 7, p. 6342.]

2. POST OFFICE (§ 49*)—PROSECUTION FOR USING MAILS TO DEFRAUD—SUFFICIENCY OF EVIDENCE.

Evidence considered in a prosecution for use of the mails in carrying out a scheme to defraud, in violation of Cr. Code, § 215 (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), and held insufficient to justify a conviction.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. § 49.*]

3. CRIMINAL LAW (§ 913*)—GROUNDS FOR NEW TRIAL—EXTRINSIC MATTERS AFFECTING JURY.

The issuance by the Post Office Department of a fraud order against a defendant, who was at the time on trial under Cr. Code, § 215 (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), which fact was prominently published in the newspapers at the place of trial, and presumably came to the jury's attention, was sufficient to render a fair trial impossible, although the issuance of the order at that time was a mere coincidence, and there was no intent to influence the case.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2137–2145; Dec. Dig. § 913.*]

4. POST OFFICE (§ 50*)—PROSECUTION FOR USING MAILS TO DEFRAUD—QUESTIONS FOR JURY—INTENT.

Where circulars sent through the mails advertising an article of manufacture, although containing exaggerated representations respecting the merits and performance of the article in use, which were perhaps misleading, also contained an absolute promise to refund the price if the purchaser was dissatisfied, such promise, if made and carried out in

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

good faith. is sufficient to negative an intent to defraud, necessary to render the sending of such matter through the mails a crime under Cr. Code, § 215 (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), and whether or not such promise was made in good faith is a question for the jury under all the evidence.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89; Dec. Dig. § 50.*]

5. POST OFFICE (§ 48*)—USING MAILS TO DEFRAUD—INDICTMENT—VARIANCE.
Under an indictment for using the mails to defraud, based on Cr. Code, § 215 (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), which charges an intent to defraud certain persons named, and others unknown, proof tending to show that, if there was an intent to defraud, it was originally a general intent to defraud any one who might answer the advertising, did not create a substantial variance.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 66–80; Dec. Dig. § 48.*]

6. INDICTMENT AND INFORMATION (§ 171*)—VARIANCE.
On the question of variance between indictment and proofs, the controlling consideration should be whether the charge was fairly and fully enough stated to apprise defendant of what he must meet, and to protect him against another prosecution, and whether those particulars in which the proof may differ in form from the charge support the conclusion that defendant could have been misled to his injury.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 536, 537; Dec. Dig. § 171.*]

7. CRIMINAL LAW (§ 1169*)—PROSECUTION FOR USING MAILS TO DEFRAUD—EVIDENCE.
On the trial of a defendant, charged under Cr. Code, § 215 (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), with using the mails to defraud, it was prejudicial error to admit in evidence over his objection a letter written two or more years before by the Assistant Attorney General to defendant, during the course of an inquiry made by the Post Office Department, clearly indicating the writer's opinion that in certain particulars defendant's business was fraudulent.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3088, 3137–3143; Dec. Dig. § 1169.*]

8. TRIAL (§ 48*)—EVIDENCE ADMISSIBLE IN PART.
Though a document contains matters relevant, and so prima facie admissible, yet. if these matters are of little evidential value, and inseparably mingled with matters inadmissible and highly prejudicial, the materiality is merged in the prejudice, and the document cannot be received.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 120; Dec. Dig. § 48 :* Evidence, Cent. Dig. § 425.]

9. EVIDENCE (§ 121*)—RES GESTÆ.
A statement, which, so far as the court can say, may be an incident immediately and unconsciously associated with the act, should be received in evidence, subject to the jury's right to reject, if they believe it "voluntary individual wariness."

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 303, 307–338, 1117, 1119; Dec. Dig. § 121.*]

10. CRIMINAL LAW (§ 396*)—PROSECUTION FOR USING MAILS TO DEFRAUD—EVIDENCE.
On such trial, defendant, who was the executive head of a large business, in the course of which the alleged fraudulent representations were made, was entitled to introduce in evidence on the question of intent certain commendatory letters from customers, which fully supported the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

representations claimed to be fraudulent, which were shown to him as received, and some of them used for advertising purposes, without introducing his entire correspondence, which it was shown was attended to by subordinates and not seen by him.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 861, 862; Dec. Dig. § 396.*

Nonmailable matter, see notes to Timmons v. United States, 30 C. C. A. 79; McCarthy v. United States, 110 C. C. A. 548.]

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

Criminal prosecution by the United States against William P. Harrison. From a judgment of conviction, defendant brings error. Reversed.

W. Knox Haynes, of Chicago, Ill., John E. Bruce, of Cincinnati, Ohio, and John J. Lentz, of Columbus, Ohio, for plaintiff in error.

Sherman T. McPherson, U. S. Atty., and Edward P. Moulinier, Asst. U. S. Atty., both of Cincinnati, Ohio, for the United States.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. Harrison (respondent below) was engaged in manufacturing and selling, at Cincinnati, various household articles. The business was of large volume and long standing. Among the articles so being manufactured and sold, in the spring of 1910, were a vacuum cleaning device known as the "New Home Vacuum Cleaner," and a washing machine called the "Easy Way Washer." Sales of these were promoted by sending through the mails advertisements and correspondence. In December, 1910, Harrison was prosecuted under two separate indictments for using the mails in a scheme or artifice to defraud, contrary to section 215 of the Criminal Code (R. S. § 5480 [U. S. Comp. St. 1901, p. 3696]). One indictment had reference to the New Home Vacuum Cleaner; the other to the Easy Way Washer. As to the vacuum cleaner, it was alleged that the scheme was formed April 20, 1910, and that the forbidden use of the mails was from April 20th to July 27th; as to the washer, that the formation of the scheme was in December, 1909, and the use of the mails on July 13 and July 21, 1910. Respondent demurred to each indictment, the demurrers were overruled, the indictments were consolidated, and respondent tried upon his pleas of not guilty. He was convicted and sentenced under each indictment, and brings these writs of error.

Judge Sanborn, speaking for the Circuit Court of Appeals of the Eighth Circuit (Union Pacific Coal Co. v. United States, 173 Fed. 737, 740, 97 C. C. A. 578, 581), has recently said:

"Where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction."

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Clyatt v. United States, 197 U. S. 207, 222, 25 Sup. Ct. 429, 433 (49 L. Ed. 726), the conviction was reversed for lack of essential evidence, and Mr. Justice Brewer said:

"It is the imperative duty of a court to see that all the elements of [the alleged] crime are proved, or at least that testimony is offered which justifies a jury in finding those elements. Only in the exact administration of the law will justice in the long run be done, and the confidence of the public in such administration be maintained."

We have reviewed this case in the light of the settled rules indicated by the above quotations, and we have reached the conclusion that there was, as to one of the indictments (the vacuum cleaner case), no sufficient evidence of guilt to justify respondent's conviction, and that it was error not to instruct, as he requested, a verdict of acquittal, and that whether the other indictment (the washer case) is governed by the same considerations depends on special reasons, which apparently were not determined by the jury. We are naturally reluctant thus to dispose of a prosecution which has occupied so much of the time and attention of a court and jury, and we have held the case for a repeated consideration of everything urged against the respondent; but we are confirmed in our conclusion. To determine its rightfulness, we have endeavored to ascertain the controlling rules of law, and have very carefully analyzed the mass of detailed, though not complicated, facts shown by the record.

[1] The statute makes it a crime—a felony—to use the mails in promoting a "scheme to defraud." This statute has received consideration, definition, and application in a great number of decided cases —among others, by the Supreme Court in Durland v. U. S., 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709, and U. S. v. Stever, 222 U. S. 167, 32 Sup. Ct. 51, 56 L. Ed. 145, and by this court in the Cases of Milby, 109 Fed. 638, 48 C. C. A. 574, Horman, 116 Fed. 350, 53 C. C. A. 570, O'Hara, 129 Fed. 551, 64 C. C. A. 81, Bartholomew, 177 Fed. 902, 101 C. C. A. 182, and Foster, 178 Fed. 165, 101 C. C. A. 485. It is by the decisions settled, not as an all-inclusive definition, but as one sufficient for the purposes of this case, that the statutory "scheme to defraud" may be found in any plan to get the money or property of others by deceiving them as to the substantial identity of the thing which they are to receive in exchange; and this deception may, of course, be by implication as well as by express words. On the other hand, the "scheme" cannot be found in any mere expression of honest opinion as to quality or as to future performance. There must be the underlying intent to defraud. Rudd v. U. S. (C. C. A. 8) 173 Fed. 912, 97 C. C. A. 462; Brown v. U. S. (C. C. A. 8) 146 Fed. 219, 76 C. C. A. 577. It is true that the Durland Case contemplates as within the statute "suggestions and opinions as to the future"; but necessary limitations on a too broad construction of this language are indicated in the McAnnulty Case, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90.

As it arises in the present case, the question is: When does the not uncommon exaggeration of advertising become sufficient evidence of an intent to defraud? Can a business man, selling an article of merit

and of value and at a fair price, be convicted of a scheme to defraud, because his advertising overstates the capacity and usefulness of the article? If so, where is the line to be drawn? And this brings us to the further question: How far are United States courts and juries to become censors of the advertising of manufacturers or dealers? This question stands out for answer, because nearly all business is now aided by advertisements passing through the mails, and on every hand we see claims of capacity, performance, and results which we know cannot stand cross-examination.

On what we think an exhaustive review of all the reported cases arising under this statute, we do not find any one which seems, on its face, to be of the class we have mentioned—exaggerated claims of merits in articles of inherent utility—unless it is Faulkner v. U. S., 157 Fed. 840, 85 C. C. A. 204, in which the Circuit Court of Appeals in the Fifth Circuit reversed a conviction because based merely on exaggerated advertising. The subject is also considered by Judge Severens, then District Judge, who said, in U. S. v. Staples (D. C.) 45 Fed. 195, 198:

"Parties who have anything to sell have the habit of puffing their wares, and we are all familiar with the fact that it is a very prevalent thing in the course of business to exaggerate the merits of goods people have to sell, and within any proper reasonable bounds such a practice is not criminal. It must amount to some substantial deception, in order to be subject to cognizance by the courts."

The "schemes" which have been punished have all smacked of the confidence game, of getting something for nothing, like selling worthless corporate stock (Wilson v. U. S. [C. C. A. 2] 190 Fed. 427, 111 C. C. A. 231); running a bucket shop under the pretense of doing real trading (Foster v. U. S. [C. C. A. 6] 178 Fed. 165, 101 C. C. A. 485); running a "fake" marriage bureau (Grey v. U. S. [C. C. A. 7] 172 Fed. 101, 96 C. C. A. 415); getting consignments without intent to remit (McConkey v. U. S. [C. C. A. 8] 171 Fed. 829, 96 C. C. A. 501); financial schemes impossible of performance (Walker v. U. S. [C. C. A. 9] 152 Fed. 111, 81 C. C. A. 329); and the like. Schemes like those discussed in Harris v. Rosenberger (C. C. A. 8) 145 Fed. 449, 76 C. C. A. 225, 13 L. R. A. (N. S.) 762, and in the cases it reviews, fall in this same class, because, though the representation affects quality or performance, it directly pertains to a fact or a plan inherent in the substantial identity—the essential characteristics—of the thing itself; and even though the original and underlying business is legitimate, the use being made of it is fraudulent.

In our review of the decisions, we have not overlooked the line of cases arising under sections 3929 and 4041 (U. S. Comp. St. 1901, pp. 2686, 2749), holding, in some cases that seem rather extreme, the right of the Postmaster General to be exempt from reversal by the courts in his conclusion that, in the given case, a "scheme to defraud" exists. These sections and 5480 do employ the identical phrase, "scheme to defraud," and are, doubtless, in some degree in pari materia; but we cannot think that the same criterion is necessarily to be applied in each case. The Postmaster General, in the exercise of some meas-

ure of delegated authority, is administering a law which confers a privilege; for the conditions under which the mails may be used are wholly in the control of Congress. Public Clearing House v. Coyne, 194 U. S. 497, 506, 24 Sup. Ct. 789, 48 L. Ed. 1092. The courts and juries, under section 5480, administer a law creating a felony. A liberality of definition, to meet the Postmaster General's ideas of the policy of the law as applied to existing conditions, may be well within the limits of his discretion. A crime cannot be created by ex post facto liberality of definition, and Congress cannot have intended to obliterate the well-known distinction pointed out by Judge Severens. The Court of Appeals of the Eighth Circuit, in Erbaugh v. U. S., 173 Fed. 433, 435, 97 C. C. A. 663, 665, said:

"The offense denounced by section 5480 was created by that statute, the punishment it prescribes is severe, and a penal statute which creates and denounces a new offense should be strictly construed. The definition of the offense and the classification of the offenders are legislative, not judicial, functions; and one who was not, beyond reasonable doubt, within the class declared punishable by the expressed will of Congress, may not be brought within that class, after the event, by interpretation."

[2] We are, then, to determine whether respondent's plan of business, as it was being carried on at the times named, could fairly be said to constitute a "scheme to defraud"; and so we come to an examination of the facts. The new vacuum cleaner was first put on the market in February, 1910, succeeding in respondent's business a somewhat similar, but cheaper and less efficient, device. The first year about 50,000 cleaners were sold. The retail price to the user was $8.50; the agent paid $4.50. The total sales for the first 11 months were $180,000. The device was manually operated, by handles swinging, bellows like, to and from each other; the handles actuated suction pistons in two cylinders; and there were the usual slotted nozzle, settling chamber, and porous fabric bag. Upon the trial, it appeared beyond dispute that the "New Home Vacuum Cleaner" was an efficient and useful device, sold at a reasonable price. Indeed, the United States Attorney frankly states that there is no ground for claiming any fraud as to those purchasers who bought after seeing the machine, and the great majority of purchasers were of this class. The only fraud claimed is as against those who sent in their money in response to advertising, without seeing the machine and relying on the respondent's circulars and letters; and so we find that the critical question is whether this literature sent through the mails contains fraudulent statements sufficient to support a conviction. We do not fail to observe that in a prosecution of this character fraud need only be in the underlying scheme, and it is not necessary that the matter sent through the mail should itself contain fraudulent statements; but in this case the fraud in the scheme is predicated solely on the alleged false and misleading statements contained in the circulars, and hence they must be examined.

They contain no full mechanical description; but they have a picture of the article, and they make clear that it is to be operated by hand. They contain much laudatory matter, and a large number of

statements charged in the indictment to be false and fraudulent. We cannot here take the time nor the space to analyze and discuss each of the statements and the evidence on that subject. It is enough to say that the advertising claims most open to criticism are: (1) That the machine has a constant and terrific suction; (2) that it will clean carpets thoroughly with little or no physical effort, and that a child or weak woman can operate it; and (3) that it will abolish housecleaning. In fact, when it was fairly and properly operated, it did have a suction practically constant, and which, while not "terrific," was yet quite strong. It would take up light dirt from a board floor or from the surface of a carpet and with little physical effort, and it would clean a carpet thoroughly, if its working was continued for a longer time and with more force. It would not "abolish housecleaning" in any absolute sense; but, if used to the best advantage, it would diminish and often avoid that periodical taking up and beating of carpets which in many homes stands for housecleaning.

In so far as these qualities of the machine were not apparent on inspection, they appeared by proof at the trial. An expert witness explained the theoretical operation and demonstrated the suction by testimony the accuracy of which is not seriously questioned; a government witness conducted a demonstration before the jury with good results; a 12 year old girl operated it before the jury with success and with no exhausting physical effort; and 25 witnesses who had purchased the cleaner and used it in their homes for a year or more testified that it was efficient and satisfactory, the testimony of each going into detail as to his or her use, and varying all the way from fair satisfaction to enthusiastic commendation.

As against this proof, there were 12 witnesses who testified that they had purchased the device and were dissatisfied. Some of the 12 apparently gave it a fair trial before concluding that it was unsatisfactory; others clearly did not. The substantial complaints seemed to be that it was too hard work to use the machine, and that it would not pick up matches, toothpicks, and pieces of paper. Every complaint that was definite enough to be intelligible belongs in one or the other of these classes; and, as to the second of these complaints, it is to be observed that the circulars cannot be fairly read as containing any representation that the machine will pick up objects of that character. No vacuum cleaner will pick up objects too large to go through the slot in the nozzle.

The sum of the whole matter is that, if we except extreme phrases like "terrific suction" and "abolish housecleaning," the utterance of which cannot be seriously thought to be criminal, we find that every statement of fact is literally true, or, more accurately, might, under favorable conditions, be literally true; and nothing remains except that this advertising matter exaggerated the quality and extent of the work the machine would do with slight physical effort, and minimized the physical effort necessary to make the machine do the complete work of which it was said to be capable. We doubt very much whether this proof would make out the necessary preponderance of evidence in a civil action brought by a party claiming to have been defrauded. We

are quite satisfied that it is wholly insufficient to establish, beyond a reasonable doubt, the criminal intent which is essential to the felony here charged. We believe the statute here under consideration was never intended to cover such puffing of goods as is found in the vacuum cleaner circulars, and it should not receive a construction which permits such result.

We do not overlook the evidence of an admission by Harrison that the work of cleaning a room with the cleaner would be too laborious for a child or weakly woman, and that he knew it could not be so used. The advertising claim that the device could be used by a weakly woman would not naturally imply that she could use it for all purposes for which it could be used by any one; and this admission, of uncertain meaning and extent, cannot fairly be construed as sufficient to change the result of the conceded or fully established facts.

[3] We should not omit to mention one occurrence upon the trial. At the time of, and shortly preceding, the arrest, the post office inspectors learned that the refunds were not being promptly made as hereafter stated. In February, 1911, while the trial below was in progress, the Post Office Department promulgated a "fraud order" against Harrison in connection with the vacuum cleaners, and this fact was prominently published in the Cincinnati newspapers, and so presumably came to the jury's attention. The record indicates no reason to suppose that the withholding of this order until after the jury was selected and the trial in progress, and its promulgation and publication in such a way as to have the most prejudicial effect upon the respondent before the jury, amounted to anything more than an unfortunate coincidence, and the occurrence was beyond the control of the trial judge; but it was of itself sufficient to make impossible that fair trial to which every respondent is entitled.

[4] We must refrain also from any detailed discussion of the facts regarding the Easy Way Washer. This device, in July, 1910, had been sold by respondent in great quantities for some years. It may be described as a combination boiler and washing machine obtaining in some measure the results of the boiling process familiar in the former and of the mechanical agitation familiar in the latter. There seems no doubt that if the boiling was continued long enough, and the mechanical agitation was frequent enough, and the other conditions favorable, the device would accomplish fairly satisfactory results. A considerable number of witnesses testified to from one to three years' use of the machine, and that it did, in their experience, everything claimed for it in the advertising; while it appeared that under other and less favorable conditions it was not so useful. It sold to the agents for $3 and to the user for $6.

Taking the Easy Way Washer advertising together, we are bound to say that it is distinctly more objectionable than the vacuum cleaner advertising. The distinction is not with reference to the claims of performance. It is difficult or impossible to put the finger on any statement on this subject which may not be literally true. The trouble is with what the circulars say or the impression they might well produce regarding the mechanical and physical features of construction

and operation; i. e., the substantial identity of the article. The circulars do not contain any informing description, pictorial or written; but they might be thought to imply that the device operates not merely with hot water and soap, boiling and stirring, but with some new, mysterious force utilized by some new construction, and we cannot say that a conclusion of intent to mislead, if these statements stood alone, would be wholly without foundation. This brings us to the question whether such inference of intent to mislead is made impossible by the further facts now to be mentioned. The advertising literature at first contained a promise to refund the purchase price if the machine was not as represented. In 1908 complaint was made to the Post Office Department regarding this subject-matter. There was a hearing in that department as to whether a "fraud order" should issue against Harrison in connection with his "Easy Way" business. It seems a fair inference from the record (and the United States Attorney states) that the advertising literature then in use was essentially similar to that which is the basis of this indictment, excepting that the promise to refund was conditional on the purchaser establishing a breach of representations. Upon that hearing, the Post Office Department in effect ruled that if Harrison would agree to and would make his refunds whenever the purchaser was not satisfied, regardless of whether the purchaser could show a breach of representations, this would neutralize any inference of fraud that might otherwise be drawn from the high-sounding phrases of the advertisements.

Accordingly he thereupon, and about July, 1908, changed his literature so as to contain this absolute promise of refund, and (with such degree of approval from the Post Office Department as may be implied from these facts) he continued to use this literature until his arrest. In other words, it appeared that, even if there might be any intent to get the purchaser's money by creating a misleading impression regarding the article to be received by him, it was accompanied by a promise, and by the legal liability to return the money, if, when the purchaser saw the article, he was not satisfied. We quite agree with the Post Office Department that this promise to refund, if made in good faith and taken in connection with the literature here used, would leave no room for the conclusion that the scheme, upon the whole, was one to defraud; and we are thus brought to the determinative question under this indictment, viz.: Whether there is a sufficient indictment and sufficient evidence to permit a conviction on the theory that the promise to refund was not made in good faith.

In the broader aspect of this question, it is sufficient to say that the indictment does not charge a general or unlimited intent not to refund, and there would be no proof to sustain such a charge if made. The corporation which was making the sales had a capital of $100,000; it had been doing, for a considerable time, a prosperous and profitable business; no lack of ample pecuniary responsibility is charged; and it had been in fact regularly refunding large sums every month. The question of intent not to refund is of narrower compass.

The indictment does not allege, as the primary or main scheme, any

plan to get customers' money by means of a promise to refund if the article was not satisfactory; but it alleges that, in connection with and as a part of the scheme to defraud by means of false representations, respondent had the further plan that, when washers had been returned as unsatisfactory with a demand for refund, he would delay the refund by excuses and subterfuges, with the purpose of wearing out, by delays, those persons who returned the article, and so to lead the customer, in many cases, to drop his demand and so to avoid a refund. This is the only delay mentioned in the indictment or made the basis of any charge, but it may well be classified as the second delay; for the proof shows that, when a customer first expressed dissatisfaction and threatened a return, it was the regular practice to correspond with him in the endeavor to persuade him to keep the article, and to this end to give him further instructions for use, to supply missing, broken, or imperfect parts, and often finally to make a concession on the price. The delays thus ensuing constituted the first class. The acts last recited are not necessarily inconsistent with legitimate business practice; but instances or systems of abuse, whereby the practice would become an instrument of fraud, are conceivable. As to the second class, it appeared that it was the practice to require one who had returned the goods and demanded a refund to procure an express or freight tracer and proof of final redelivery, a requirement sometimes or often justified, but in many cases wholly unnecessary; that then there would often be no attention paid until another letter was written; that finally the refund would be "marked up" for payment and turned over to the cashier's office; and that then, at frequent intervals, such accumulated refunds would be paid.

It further appeared, and stands apparently undisputed on the present record, that the refunds had regularly amounted to about 5 per cent. of the washer sales; that except for the delays above mentioned they had been regularly paid, amounting to about $300 per month; that they were so paid until about May or June; that the respondent was interested in other enterprises, in aid of which he drew money out of this enterprise, and during the summer was "hard up"; that the refunds accumulated and remained in part unpaid; that about October he raised some money and wholly or mainly paid them up; that they then accumulated again somewhat, and at the time of his arrest were unpaid to the extent of about $1,200 (in both branches of the business); and that these were later all paid.

The argument is plausible that the indictment charges only a specific intent to escape some refunds by means of the second class of delays above specified, and that the subject of respondent's financial situation in July, whereby he perhaps should have anticipated that he could not make refunds promptly, has no bearing to establish this specific intent; but we have concluded that this is too narrow a view of the indictment. The substantial and the main charge is that of intent to defraud by the circulars. What is said about the refunding delays is supplemental, and is practically, as the case has developed, by way of anticipatory reply to the defense that the circulars were upon the whole innocent of fraud, because accompanied and char-

acterized by the promise to refund. We interpret the indictment as charging in effect that the promise to refund did not neutralize the alleged misleading of the circulars, because the promise itself was not made in good faith; and hence it follows that the entire situation bearing on the good faith of this refunding promise, as it constituted a part of the business scheme in existence on July 13th and 21st, should be considered. To state the matter in another form, the issues under this indictment were, first, whether the literature, circulars, and advertising sufficiently show an intent to defraud as to the essential characteristics of the article; and, if so, then second, whether the promise to refund, as a part of the business scheme, was made in good faith, whereby it would be effective to characterize the entire scheme, or in bad faith, whereby it would be ineffective.

As to the first issue: The good or bad faith of the representations of extreme performance is involved because, while the identity—the real characteristics—of the thing, and not its claimed merit, is the criterion, yet, under the facts here existing, the latter is interwoven with the former; and it cannot be said that bad-faith claims of remarkable performance would not have some tendency to show intent to mislead as to what the thing was.

As to the second issue: The refunding delays which did occur, and such knowledge as respondent had that he might not be able to pay, and such express proof as there may be, if any, of a wrong intent, stand on one side; on the other side is respondent's theory that the delays which did occur up until about June, so far as they were systematic, and not accidental or inadvertent, were consistent with legitimate business practice, and that, so far as additional delays occurred after that time, these were due to financial difficulties, which he did not anticipate and which were unavoidable. In this connection it will not be overlooked that the intent charged is to avoid—that is, not to make—a part of the refund payments, and if the sum of respondent's offense in this respect was an intent to delay, so as to get the use of the money for a time, with no plan to avoid payment altogether, that would not constitute the crime charged. To predicate crime upon such an intent, with reference to any pecuniary obligation, is obviously unsafe.

The determinative character of this refund promise was not developed on the trial below, so that, very naturally, this issue was not distinctly submitted to the jury. We cannot know that the proof on either side was exhausted; and as there must be a new trial, upon which the record may be different, it would be premature to undertake to determine whether the record on this trial is or is not, in all respects, substantially as consistent with the theory of innocence as with the theory of guilt.

We distinguish between the vacuum cleaning case and the Easy Way Washer case, in the result reached, for the reason that in the former, while a somewhat similar charge is made on the subject of refunds, and a somewhat similar state of facts appears, we find no sufficient basis for a charge of fraud in the advertising, nor any room for an uncertainty of intent therein which may be solved one way or

the other; and as a fraudulent scheme in that respect is the basis of the indictment, the charge must fail, and, there being no primary scheme, the accessory or supplemental scheme is not important. In the latter, the advertising being susceptible of a construction importing fraud, the true character of the refunding promises becomes, now and here, controlling.

There are 90 assignments of error relating to occurrences in the progress of the cause. We take up now only those which seem likely to be of importance on a new trial.

[5] 1. There was no variance between the indictment and proof concerning the persons whom it was intended to defraud. The indictment charges that the scheme, as framed, was to defraud certain persons named, and others, some of whose names were unknown, and some of whose names were known, but were too voluminous to set out. The proof, fairly construed, tends to show that, if there was intent to defraud any one, it was originally a general intent to defraud that portion of the public who might answer the advertising or be otherwise reached; and that this intent afterwards, from time to time, localized and attached itself to the individuals named who did answer the advertising. We cannot regard this as a substantial variance, but we must consider it rather as two different ways of stating the same thing.

[6] Upon the question of variance between indictment and proofs, the controlling consideration should be whether the charge was fairly and fully enough stated to apprise defendant of what he must meet, and to protect him against another prosecution, and whether those particulars in which the proof may differ in form from the charge support the conclusion that respondent could have been misled to his injury (Foster v. U. S. [C. C. A. 6] 178 Fed. 165, 171, 101 C. C. A. 485; Bennett v. U. S. [C. C. A. 6] 194 Fed. 630, 632, 114 C. C. A. 402). Applying these criteria, the court below was right in overruling this objection. The present case may well be distinguished from Commonwealth v. Harley, 7 Metc. (Mass.) 506, and similar cases, by the fact that there the indictment charged a plan to defraud certain named persons only, and did not suggest an intent to defraud the public or any class of the public; while here the naming of several persons and the references to many others, read in connection with the statement that the scheme was to be operated by circulars, and by advertising in newspapers and magazines, fairly import a charge of intent to defraud a part of the public.

[7] 2. A letter from the Assistant Attorney General for the Post Office Department, written to respondent, in June, 1908, in connection with the inquiry then held, and which we have before mentioned, was offered in evidence by the government. Parts were excluded, but enough was received and read to the jury to make clear, either by express statement or by inference, that this official had decided the Easy Way Washer business to be a fraudulent, rather than a legitimate, business, unless saved from that condemnation by the offer of refunds, conditioned only on dissatisfaction, and by the prompt payment thereof. Whether the business, as evidenced by the circulars

and advertising, was legitimate or fraudulent, was one of the issues for the jury; and, obviously, what the Attorney General had decided or had said on that subject was, primarily, inadmissible. It is clear, too, that the prejudice to the respondent from putting before the jury the opinion and decision of so high an officer of the government was bound to be very substantial.

[8] This general situation seems to have been recognized by counsel and by the court below; but it was thought not to cover the instant question, because this letter was a part of the information which came to respondent regarding the conduct of the business and the making of complaints, and so had some bearing on his intent. While we may concede that the letter was not wholly immaterial upon the subject of intent, it was, at the best, remote in point of time, and of uncertain effect in this respect. Whatever materiality it might have is subordinate to, and merged in, its more generally objectionable and injurious character as evidence; the minor, rightful bearing on intent would necessarily be inseparable from the major wrongful effect of the recited decision; and the limitations made and instructions given by the court as to the force which could be permitted to this letter could not, we think, operate to prevent serious harm flowing from its reception to respondent's rightful interests. It goes without saying that respondent may waive this objection, and if he considers this letter and his answer upon the whole helpful to him on the issue of intent, they form part of the situation which he will have the right to put in evidence.

[9] 3. The nature of the issue to be tried, as it has been developed in this opinion, will make it clear that the respondent's acts and efforts in the summer of 1910 to raise money with which to meet these refunds will directly bear on his intent to pay, or to avoid payment. Even his statements made in the course of such efforts, if natural to be made in connection therewith, and if not made in anticipation of this controversy, will be admissible as part of the res gestæ bearing on his intent. His statements in August that he wished his agent to use all available property as security to borrow money, on account of its urgent need for making refunds, was, so far as the court could say, very probably an "incident immediately and unconsciously associated with the act." If the jury regarded it as "voluntary individual wariness," then it would lose its evidential force. St. Clair v. U. S., 154 U. S. 134, 149, 150, 14 Sup. Ct. 1002, 38 L. Ed. 936.

[10] 4. If the highly laudatory statements in the advertising as to the capacity, performance, and merits of the washer were made by the respondent in the belief that they were true, that belief would be a complete defense, however inaccurate the statements might turn out to be. His belief on this subject at the time of forming or continuing the scheme was, therefore, a controlling question. To support the claim that he believed what he said, his counsel offered to show that certain testimonial or commendatory letters received in the regular course of the business had been selected by his subordinates and shown to him, and that these letters contained statements that the machine did everything claimed for it. There are said to be over a thousand of these let-

ters. The offer was many times repeated in varying forms, and it seems to be the claim of the respondent that he was the executive head of this large business; that he did not, ordinarily, see the correspondence; that, by his instructions, testimonial letters were selected and brought to him, and some of them used as the basis of his advertising; but that complaining letters (a great many of which it was conceded were received) were attended to by his subordinates, and he never saw them, unless in exceptional instances. Objection was made to the proof that these testimonial letters were shown to respondent, the objection being on the ground that the writing of the letters was not properly proved; and this resulted in a ruling that the admissibility of the letters depended on the showing that they were received in due course of business and constituted a part of the regular conduct of the business, and that, therefore, the entire course of business must be shown—in other words, that the defendant could introduce these letters only if he would put in all the letters received, which he refused to do.

We think this ruling rests on a misapprehension as to the ground on which the letters were receivable. If they were in fact laid before respondent as and for genuine letters, and if he believed them so to be, and in that belief acted on them, these things bore on his intent. It was not necessary first to show that they were signed by the writers, or mailed by the writers, or that their recitations of fact were true. In the ordinary case involving the admission of letters, it is these things which are of primary importance; but here the primary question was whether Harrison saw these letters, and believed them to be genuine correspondence, and on them based his statements. Whether it is credible that respondent knew of the testimonials, but not of the complaints, and whether, in connection with all these circumstances, such testimony sufficiently supported his alleged belief, were for the jury.

In each case, the judgment will be reversed, and the record remanded for a new trial.