**UNITED STATES v. CORLIN et al.**

No. 14806–Y.

District Court, S. D. California, Central Division.

April 27, 1942.

Wm. Fleet Palmer, U. S. Atty., Norman W. Neukom, Asst. U. S. Atty., and Ralph E. Lazarus, Asst. U. S. Atty., all of Los Angeles, Cal., for the Government.

Ames Peterson, of Los Angeles, Cal., for defendant Corlin.

David H. Cannon, of Los Angeles, Cal., for defendants Rockwell and Frankfort.

Ben L. Blue, of Los Angeles, Cal., for defendants Berliner, Coleman, Edelman, Friedman, Kay, Landfield, Nudelman, Pereira, Rubins, and Milo.

YANKWICH, District Judge (after stating the facts as above).

In announcing the decision in this case, I desire to advert briefly to some fundamental legal principles which govern prosecutions under the mail fraud statute (18 U.S.C.A. § 338).

The aim of the statute is to punish the use of the mails in furtherance of schemes to defraud. And, while it is said generally that the gist of the offense is the use of the mails, the statement means nothing more than that the basis for federal intervention lies in the use of the mails. For, without it, constitutional power would be lacking in the Federal Government to punish frauds which, by their nature, are localized and do not partake of an interstate character. A scheme to defraud is, of course, the first element of the offense. Without it, the use of the mails would not be illegal. United States v. Young, 1914, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548; Havener v. United States, 10 Cir., 1931, 49 F.2d 196. In Postal Decisions, 1939, page 237, we find this summary of the necessity for, and the meaning of, a "scheme to defraud": "Devising of scheme.—The devising of some scheme or artifice to defraud, or to obtain money or property by fraudulent representations, etc., is the first ingredient of the offense, which becomes punishable when the mails are used in its execution or attempted execution. The words 'intending to devise' are the legal scales by which the scheme is to be weighed, and require that the intent and scheme to defraud shall exist at the time the mails are used. To devise a scheme or artifice to defraud is to form a plan, device, or trick to perpetrate a fraud upon another, and devising of it continues as long as the scheme is in process of execution. It is not necessary that accused by the inventor or originator of the scheme or artifice, which may be as old as falsehood, or that when the artifice was devised the schemers should have worked out all the details of its execution."

In United States v. Dexter, D.C.Iowa 1907, 154 F. 890, 896, a "scheme" is defined: "A 'scheme' may be said to be a design or plan formed to accomplish some purpose. An 'artifice' may be said to be an ingenious contrivance or device of some kind, and when used in a bad sense the word corresponds with 'trick' or 'fraud.' Hence a 'scheme or artifice' to defraud, within the meaning of this statute, would be to form some plan or devise some trick to perpetrate a fraud upon another."

No person can be convicted of the offense unless it be shown, beyond a reasonable doubt, that he, *knowingly*, devised a scheme to defraud and that the mails were used in furtherance of it. The offense is one requiring specific intent. Without it, the offense cannot be committed. Because of this, good faith of the accused is a complete defense.

As one court has stated: "The ultimate issue of fact was whether defendants were actuated by an intent to defraud when using the mails." Sandals v. United States, 6 Cir., 1914, 213 F. 569, 574. In the same opinion we find this language:

"A man may be visionary in his plans and believe that they will succeed, and yet, in spite of their ultimate failure, be incapable of committing conscious fraud. Human credulity may include among its victims even the supposed imposter. If the men accused in the instant case really entertained the conviction throughout that the oil properties and the stock in dispute possessed merits corresponding with their representations, they did not commit the offense charged. As Mr. Justice Brewer

said in Durland v. United States, 161 U.S. 306, 313, 16 S.Ct. 508, 511 (40 L.Ed. 709):

" 'The significant fact is the intent and purpose. The question presented by this indictment to the jury was not, as counsel insists, whether the business scheme suggested in this bond was practicable or not. If the testimony had shown that this Provident Company, and the defendant, as its president, had entered in good faith upon that business, believing that out of the moneys received they could by investment or otherwise make enough to justify the promised returns, no conviction could be sustained, no matter how visionary might seem the scheme.'

"In Rudd v. United States [8 Cir.], 173 F. 912, 913, 97 C.C.A. 462, 463, the scheme to defraud and the circulars sent through the mails to promote it concerned a machine designed as an attachment to a pump for lifting water, which was shown to be 'contrary to well-known fundamental physical laws.' In respect of the defense of honest belief in the efficiency of the machine, Judge Hook said:

" 'The main defense was that, though the machine may have been impracticable, the accused honestly believed in its efficiency, and that what he did was without intent to defraud. Of course, if this was so, there was no violation of the law which was designed to prevent the use of the post office in intentional efforts to despoil.' "

See, also, Harrison v. United States, 6 Cir., 1912, 200 F. 662; Gold v. United States, 8 Cir., 1929, 36 F.2d 16, 32.

In some respects, this case is unique.

Ordinarily, in cases of this character, involving misrepresentations in sales, we find, as defendants, all the officers of the Company who have a proprietary interest in its assets, to which are, often, added some of the most prominent of the salesmen who profited mostly from the sales. Here, however, only one of the officers of the company, Corlin, is selected for prosecution. The other officer, who is, practically, a fifty per cent owner of the business of the land company, appears in an inculpatory role. None of the employees actually in charge of the office is prosecuted, although most of them are brought in to testify for the Government, as to the misdeeds of the one accused owner. The result is an indictment, which originally contained thirty-one counts of mail fraud violation and one count of conspiracy (18 U.S.C.A. § 88) and seventeen defendants. With the dismissal of five of the counts by the Government and of the conspiracy count by the Court, there still remain twenty-six counts. The number of defendants actually on trial has been reduced to fourteen. As to two, the Government has dismissed, the other entered a plea of nolo contendere. Thus, of all the defendants before the Court, in this case, only one has a proprietary interest in the business. The others were salesmen.

So we have the unusual situation of one officer and stockholder of a land-owning company, which has existed and operated for a long period of years, being charged with devising a scheme with his salesmen to use the mails to defraud. Singularly, as one of Government counsel conceded, there is no direct evidence of any sales meetings at which anyone, either a salesman-defendant or the owner-defendant, gave any instructions to any of the salesmen along the line charged in the indictment.

■ Yet the Government would fasten criminality on the owner-defendant and all these agents for the acts of the others upon inferences to be drawn from the fact that they made representations of the same character. This anomalous situation has resulted in the suggestion made by counsel for the Government, in the closing argument, that, because of the absence of concert of action between these various salesmen-defendants, perhaps, each of them should be found guilty only on the counts which specifically referred to him. This suggestion is but the measure of the weakness of the Government's position. The scheme to defraud is pleaded in Count One and is embodied, by reference, in the preamble to every count in the indictment. And the indictment, in each count, charges *not* separate defendants with a scheme to defraud and the mailing of the particular letter, but each and all of them. The individual sale, through the use of the mails, to be criminally actionable, must refer back to the scheme. And a verdict which would find certain defendants guilty only as to certain transactions which they handled would, in itself, negate the existence of the scheme. For, if there be a fraudulent scheme to which the defendants were knowingly parties, each is liable for the acts of the others. See, Rob-

inson v. United States, 9 Cir., 1929, 33 F. 2d 238, 240; Bogy v. United States, 6 Cir., 1938, 96 F.2d 734, 741; Alexander v. United States, 8 Cir., 1938, 95 F.2d 873, 878, 880; Baker v. United States, 8 Cir., 1940, 115 F.2d 533, 540. On the other hand, if each defendant is guilty only in relation to the sale which he made, then we have *not one scheme, but as many schemes as there are defendants*. Individual representations, unrelated to each other, and not a part of a scheme to defraud, cannot be given the dignity of a scheme to defraud. See, Rude v. United States, 1935, 10 Cir., 74 F.2d 673.

It is thus axiomatic that before any of the defendants can be found guilty, there must be shown, beyond a reasonable doubt, that a scheme to defraud through the use of the mails was devised by them or some of them in which they all participated. And the scheme must be proved substantially as laid. Hass v. United States, 8 Cir., 1938, 93 F.2d 427, 435; Rude v. United States, 10 Cir., 1935, 74 F.2d 673, 677. The indictment has laid the scheme within a narrow compass, both as to time and character. The beginning of the scheme is laid in the indictment as "on or about the year 1937 and thereafter to and including the date of the finding and presentation of this indictment," (February 26, 1941). Where the continuity of a scheme is relied on, the Government is not limited strictly, in point of time, to the starting point it chooses to designate in the indictment. But here the Government has circumscribed itself to the period it chose, through the evidence it offered.

To prove the formation of the scheme, the Government leaned heavily upon Mr. H. C. Schultz, a member of the Bar for many years, who, evidently, devoted most of his activities to business enterprises. He was associated with the defendant Corlin in the ownership of the Clevelin Realty Co. which was named for him—Clevelin being his middle name—for a long period of years. However, Schultz, while endeavoring to inculpate the defendant Corlin, denies that the activities in selling club memberships as an inducement to the purchase of real estate, after the contract entered into by the Company and Norman B. Frankfort and Milton S. Frankfort on May 26, 1937, and the subsequent agreement with the same parties in January, 1938, both of which he executed, had anything fraudulent about them. He emphatically states that he not only signed, but that he also drew the agreements after discussions with the Frankfort brothers and the defendant Corlin and did not write into either anything which he considered fraudulent.

Examination of the contracts confirms this. The first contract shows clearly that the club memberships were to be used as an inducement to sell real estate, as the whole income from the sale of the associate club memberships was to be retained by the sellers. And they were to receive fifty percent from the sale of life memberships which carried with it the right to a lot. Similar provisions, with different percentages, are contained in the 1938 contract. Schultz states that nothing to which he could make any objection occurred prior to the appearance of the Frankfort Brothers on the scene. The Government, by offering him as a witness, represents him as worthy of credit. See, Dravo v. Fabel, 1889, 132 U.S. 487, 490, 10 S.Ct. 170, 33 L.Ed. 421. It cannot be heard to charge, as it did in the argument, that, perhaps, Schultz was also a party to the fraudulent scheme. I prefer to think that he told the truth, in this respect, and that there is nothing in the actions of the company, of which he was half-owner, prior to and including these contracts, of an objectionable character.

The facts in the record warrant this conclusion. For we find a history of sales of memberships long ante-dating the arrival of the Frankforts and Rockwell on the scene—memberships which, like those under scrutiny here, contained a valuation on their face, in different amounts depending on the privileges to be enjoyed by the member. We find Schultz participating in devising the forms, although objecting to some of the clauses. These contracts show a variation in the price of memberships, depending upon the privileges to be secured.

The facilities to be offered were facilities actually existing and owned by the company. The Club has been actually in operation for over ten years. From descriptions and photographs it appears to be a club of some pretention, with varied facilities, the like of which are found in clubs located on lake shores in this and other parts of the country. Actually, the undisputed evidence is that some $200,000 had been expended by the Club on the facilities. And, while the indictment charges that the membership was of little or no value, the evidence is the

other way. At one stage of the case, when it was disclosed that the club only had nineteen sleeping rooms, six of which were occupied by employees, I thought, perhaps, that the essence of the scheme might lie in the fact that, with the sale of a large number of memberships, it could be inferred that such a promise would be impossible of performance and might be considered fraudulent. But a re-examination of the indictment disclosed that this was not charged as a part of the scheme. More, in the contract of January, 1938, signed by Schultz, there was a guarantee on the part of the Frankforts to sell not less than 1,200 memberships and not less than 500 life membership privileges annually commencing January 2, 1938, and not less than 800 life membership privileges per annum thereafter. Clearly, Schultz, who is vouched for by the Government, did not contemplate a fraudulent scheme through these clauses.

Much has been made of the fact that these memberships carried a valuation on their face. Since the case was argued, I have re-examined all the certificates of membership introduced in evidence ranging in price from $250 to $750, some of them dating back to the time when Schultz participated actively in the affairs of the company. And I find each of them had such valuation. Each of them contained a provision calling for the payment of that amount for the membership. In the specimens which were exhibited in court as having been sold to various persons, who appeared as witnesses, a large stamp in red type placed next to the price mark, and, sometimes, across the body of the contract stated the entire cost of membership and broke down the total figures to the items for which the charge is made, including, each time, a maintenance fee. We do not know when the system originated. It is not charged that the instrument, in the manner in which it was worded, was a deceit. Perhaps, if the actual price had not been superimposed upon each contract and the clause requiring payment of the face value had not been cancelled in a manner which is noticeable to anyone looking at the contract, it might well be argued that the idea of placing a large valuation on membership was intended to deceive. But here, again, we cannot ground conviction on suppositions or suspicions. Read v. United States, 8 Cir., 1927, 42 F.2d 636; Eng Jung v. United States, 3 Cir., 1930, 46 F.2d 66; Cox v. United States, 8 Cir., 1938, 96 F.2d 41; Mazurosky v. United States, 9 Cir., 1939, 100 F.2d 958. More, the Government has not charged this as of the essence of the scheme.

Significantly, also, these contracts, in addition to the usual clause stating that no representations had been made, contained the following clause: "11. This membership privilege is transferable by inheritance or by resale to a person of the White or Caucasian Race over twenty-one years of age, acceptable to said Club and subject to the restrictions and transfer provisions of said Club, but no transfer will be approved before twelve months from date of issue, except by special action of the Board of Directors." This was printed in bold face type in every form of membership contract. It may be conceded that a clause of this character does not stand in the way of proving a fraudulent scheme. But when we are dealing with a charge of felony, and we find that, over a long period of years, the owners of property have sought to protect themselves against irresponsible agents by a clause of this character, *which appeared in bold face type in every contract*, and that copies of these contracts were exhibited to, or left with, or read by the buyers, it would do violence to the rule which refuses to apply the law of civil agency to criminal cases, to allow purchasers, who buy under a contract which states clearly the conditions under which resales can be made, to fasten criminality on the principal by claiming a promise made by an agent in direct violation of the delimitation of authority clearly contained in the contract.

The principle I have in mind is that there is no criminal responsibility of a principal for the acts of his agent unless the principal knowingly and intentionally aids, advises, or encourages the criminal act committed by the agent. People v. Armentrout, 1931, 118 Cal.App.Supp. 761, 1 P.2d 556. In Nobile v. United States, 3 Cir., 1932, 284 F. 253, 255, the Court said: "Criminal liability of a principal or master for the act of his agent or servant does not extend so far as his civil liability. *He cannot be held criminally for the acts of his agent, contrary to his orders, and without authority, express or implied, merely because it is in the course of his business and within the scope of the agent's employment, though he might be liable civilly.*" (Italics added) And see my opinion in United States v. Food and Grocery Bureau of

Southern California, D. C., 1942, 43 F.Supp. 966.

█ I am stressing this point because, in the closing argument, counsel for the Government indicated a willingness to rest the case upon the promises or resale and the promises of interest in, or dividends from, water rights, alleged to have been made by some of the salesmen-defendants. But the difficulty is that even if it be assumed that certain salesmen did make these representations, they would have no significance, unless they were a part of a scheme to defraud. Except in instances where two salesmen were together, there is no showing of any concert of action by the salesmen with one another, or with the owner-defendant. And clearly, a scheme to defraud cannot be inferred from mere similarity of promises by persons who have no responsibility to each other. It is true, of course, that if it be shown beyond a reasonable doubt, that some of the defendants, such as the defendants Frankfort, Rockwell and Corlin, originated the scheme, then each of the other defendants who, knowing its fraudulent nature, helped in furthering it, would be guilty. See, Lefco v. United States, 3 Cir., 1934, 74 F.2d 66, 68, 69; Cossack v. United States, 9 Cir., 1936, 82 F.2d 214; Lee Dip v. United States, 9 Cir., 92 F.2d 802, 803.

But the evidence does not prove the existence of such scheme. The contrary, in fact, is shown. Every salesman who testified, including W. W. Clark, who entered a plea of nolo contendere, stated that the instruction of the owner-defendant Corlin, when he employed him, was to go out and see the property. Relating his conversation with Corlin, Clark testified:

"Q. Incidentally, Mr. Clark, how long have you been in the real estate business? A. Oh, approximately since around 1922.

"Q. Do you recall having a conversation with the Defendant Abe Corlin around January of 1939? A. Yes, sir.

"Q. Where did that conversation take place? A. In his office.

"Q. That was located where? A. I believe 740 South Broadway.

"Q. Who was present besides yourself and Mr. Corlin, if anyone? A. Nobody, sir.

"Q. Now, Mr. Clark, relate that conversation that you had at that time as best you can remember it now. A. Well, it so happened to be at that time that I was in business in Palm Springs. Due to adverse business conditions, my business was failing. In fact, I had to fold up and go out of business. I came to Los Angeles to see if I could make any contacts here. I learned there was a position open with the Elsinore Recording Company collecting delinquent accounts.

"I approached Mr. Corlin—I had met Mr. Corlin in 1935—introduced myself, and asked him if there was such a position open, or if I could secure a position with him; that I had formerly acted as collector here in Los Angeles and I thought that I could bring up some of the delinquent accounts. He said there was no opportunity at that time, that business was very poor with him, that he couldn't afford to pay a salary, but they were at that time selling memberships in what was known as the Aloha Beach Club and Country Club, and that some of the boys were making a pretty good living at it. He said if I cared to enter into the sale of memberships that I could probably make a better living than working as a collector.

"I also mentioned the fact to him that I wasn't quite ready at that time, that I hadn't completed my business at Palm Springs.

"He said: 'Well, we suggest when you go back to Palm Springs, that you go around by the way of the Club and take a look at the property, and if at the time you close your affairs, you feel that you still want to go to work for us, why, drop in and see us and we will see what we can do for you.' * * *

"Q. Now, you did thereafter go down to Palm Springs, did you not, Mr. Clark? A. Yes, sir.

"Q. On the way back you looked over the premises of the Lake Elsinore Country Club, and you found a pretty nice edifice, there, did you not? A. Yes, sir, I certainly did.

"Q. And after you returned to Los Angeles, Mr. Clark, did you have a conversation, a further conversation, with Mr. Corlin? A. Yes.

"Q. Approximately when? A. Some time the latter part of January or February of that year.

"Q. All right. Now, tell me who was present when you first saw Mr. Corlin in

January or February of that year after returning from Palm Springs. A. Mr. Corlin.

"Q. Relate that conversation, as best you can remember it. A. *I told Mr. Corlin that I had been down to Palm Springs and closed up my business, and that I stopped by the Club and saw it, and it was a very beautiful-looking affair, and I felt I should like to go to work under the terms and conditions that he previously mentioned on my last trip up to Los Angeles. And he said, 'Well, I guess he could work it out all right.' He said that I could get ready and go to work."* [Volume 1, Official Transcript, p. 137, line 18 to page 141, line 13.] (Italics added)

The salesmen were given a kit, for which they had to pay, and were urged to go out and sell on the basis of what was contained in the kit and what they saw.

They all denied any intention to defraud. Not only did they deny that Corlin suggested that they make any fraudulent promises, but they actually testified to their own belief in the value of what they were selling.

There is evidence in the record showing that certain complaints were called to the attention of Corlin. I do not believe that we can retroject his failure to act into the past in order to charge him with the conception of a scheme, in 1937 or prior thereto, at a time when his co-owner of the business, Schultz, states positively that nothing fraudulent was contemplated.

As said by Judge Learned Hand in United States v. Dellaro, 2 Cir., 1938, 99 F.2d 781, 783: "Inaction is of course acquiescence, but acquiescence is passive, and to become a party to a crime one must affirmatively unite oneself with the venture, or, in the case of a conspiracy, must agree to take some part in it."

If there were misrepresentations, they were separate and individual misrepresentations of different persons employed at different times (see, Rude v. United States, 10 Cir., 1935, 74 F.2d 673), each acting for himself, made without the authorization of the other defendants and in direct repudiation of the positive limitation of authority which the owner-defendant, for his own protection, had caused to be inserted in the contract. See, Nobile' v. United States, 3 Cir., 1922, 284 F. 253, 255; Paschen v. United States, 7 Cir., 1924, 70

F.2d 491, 503. At best, they were, in essence, matters punishable by local state law.

But, even in this respect, it is significant that, despite many voiced dissatisfactions, state authorities took no action. Even after the arrest in Oakland of Corlin and of the two salesmen who seem to be "the head and front of the offending", according to the Government's theory, on complaint of one of the buyers, they were released, without any charge being lodged against them, after three days' detention.

The idea of giving away memberships as an advertising medium originated during the Schultz regime. Inherently, there was nothing fraudulent about it. Through the perspective of distance "award" may readily become "prize", as some of the purchasers testified. But there *was* selection of certain cards for certain districts. And there is no showing that the selection was deliberate so as to "catch" persons who would not use the memberships. A long residence in California, which extends over both the northern and southern part of the State, has made it evident to me that its humblest citizens avail themselves of its recreational facilities, regardless of distance.

When the City of Los Angeles maintains free summer camps in the Mono Lake district, three hundred miles away from Los Angeles, to which wage earners not only gladly travel, but scramble for the privilege of one week's stay, it cannot be argued that the sale to a resident of Northern California or Arizona of a membership in a country club, situated in a climate different from theirs, with swimming, boating and other facilities, open to the buyer, his family or friends, had the badge of fraud.

More, the indictment does not make the charge in this broad manner. It limits it to the failure to hold a drawing.

I think the representation was substantially true. At least, I hesitate to ground a conviction of felony upon the fine distinction between "an award" and "a prize" or between "a drawing" and "a selection".

The representation as to the members being potential water users was also evolved during the Schultz regime. At least, it was discussed with him and notice of the possibility of such use was stamped across some of the membership forms either prepared by Schultz or used with his knowledge.

So, as the Government vouches for his integrity, I have the right to assume that he would not have sanctioned this feature, had it had any of the earmarks of fraud.

Any exaggerations by individual salesmen were not in pursuance of any scheme to defraud. See, Harrison v. United States, 6 Cir., 1912, 200 F. 662.

I add that the sales of memberships resulted, ultimately, in loss to the Company. When receipts were distributed to the stockholders, Schultz was one of the recipients. And if, as he claims, money is still due him, the owner-defendant Corlin has a similar claim.

█ I know, of course, that the success or insuccess of a scheme is not material' if it be devised to defraud. Hass v. United States, 8 Cir., 1938, 93 F.2d 427, 432; Muench v. United States, 8 Cir., 1938, 96 F.2d 332, 336; Norman v. United States, 6 Cir., 1939, 100 F.2d 905, 907.

But when the Government, to prove bad faith, seeks to show what was realized from the sales, losses resulting to the selling concern are as important on the question of good faith. For a going real estate concern would not, ordinarily' engage, over a period of years, in a *losing enterprise,* if its object be fraud. And the amounts received by the salesmen did not exceed reasonable salaries.

Here I stop.

█ The arduous task imposed upon me by the trial of this case without a jury for a period of three weeks, with long sessions, makes it impossible, within the short time I have allowed myself since the closing of the arguments, to discuss' in greater detail' some of the other elements of deception which have been pleaded in the indictment or stressed in the argument. In what I have just said I have covered the most important phases. And I have sought to indicate why, in my opinion, after a thorough consideration of all the evidence in the case, in the light of the principles of law governing cases of this character, I am of the view that the Government has failed to prove, beyond a reasonable doubt, that any of the defendants is guilty of the crime charged in the indictment.

I, therefore, find the defendants Abe Corlin, Murray A. Berliner, Joe Coleman, Leo H. Edelman, Milton S. Frankfort, Fred Friedman, H. A. Kay, Philip E. Landfield, Jay Joseph Nudelman, Aubrey Pereira, Harry Rockwell, Sam Rubins, Leo F. Strong, Stephen Milo, and each of them, not guilty as charged in Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 of the indictment.